# HOLDEN *v.* HARDY (No. 1).

# HOLDEN *v.* HARDY (No. 2).

ERROR TO THE SUPREME COURT OF THE STATE OF UTAH.

Nos. 261, 264. Argued October 21, 1897. — Decided February 28, 1898.

The provisions in the act of March 30, 1896, c. 72, of Utah, providing that "The period of employment of workingmen in all underground mines or workings shall be eight hours per day, except in cases of emergency where life or property is in imminent danger;" that "The period of employment of workingmen in smelters and all other institutions for the reduction or refining of ores or metals shall be eight hours per day, except in cases of emergency where life or property is in imminent danger;" and that "Any person, body corporate, agent, manager or employer who shall violate any of the provisions of sections one and two of this act shall be deemed guilty of a misdemeanor," are a valid exercise of the police power of the State, and do not violate the provisions of the Fourteenth Amendment to the Constitution of the United States by abridging the privileges or immunities of its citizens, or by depriving them of their property, or by denying to them the equal protection of the laws.

The cases arising under the Fourteenth Amendment are examined in detail, and are held to demonstrate that, in passing upon the validity of state legislation under it, this court has not failed to recognize the fact that the law is, to a certain extent, a progressive science; that in some States methods of procedure which, at the time the Constitution was adopted, were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been found to be no longer necessary; that restrictions which had formerly been laid upon the conduct of individuals or classes had proved detrimental to their interests; and other classes of persons, particularly those engaged in dangerous or unhealthy employments, have been found to be in need of additional protection: but this power of change is limited by the fundamental principles laid down in the Constitution, to which each member of the Union is bound to accede as a condition of its admission as a State.

THESE were writs of error to review two judgments of the Supreme Court of the State of Utah, denying applications of the plaintiff in error, Holden, for his discharge upon two writs of *habeas corpus*, and remanding him to the custody of the sheriff of Salt Lake County.

The facts in case No. 261 were substantially as follows: On June 20, 1896, complaint was made to a justice of the peace of

Salt Lake City that the petitioner Holden had unlawfully employed "one John Anderson to work and labor as a miner in the underground workings of the Old Jordan mine in Bingham cañon, in the county aforesaid, for the period of ten hours each day; and said defendant, on the date aforesaid and continuously since said time, has unlawfully required said John Anderson, under and by virtue of said employment, to work and labor in the underground workings of the mine aforesaid, for the period of ten hours each day, and that said employment was not in case of an emergency or where life or property was in imminent danger, contrary," etc.

Defendant Holden, having been arrested upon a warrant issued upon said complaint, admitted the facts set forth therein, but said he was not guilty because he is a native-born citizen of the United States, residing in the State of Utah; that the said John Anderson voluntarily engaged his services for the hours per day alleged, and that the facts charged did not constitute a crime, because the act of the State of Utah which creates and defines the supposed offence is repugnant to the Constitution of the United States in these respects:

"It deprives the defendant and all employers and employés of the right to make contracts in a lawful way and for lawful purposes;

"It is class legislation, and not equal or uniform in its provisions;

"It deprives the defendant, and employers and employés of the equal protection of the laws; abridges the privileges and immunities of the defendant as a citizen of the United States, and deprives him of his property and liberty without due process of law."

The court, having heard the evidence, found the defendant guilty as charged in the complaint, imposed a fine of fifty dollars and costs, and ordered that the defendant be imprisoned in the county jail for a term of fifty-seven days, or until such fine and costs be paid.

Thereupon petitioner sued out a writ of *habeas corpus* from the Supreme Court of the State, annexing a copy of the proceedings before the justice of the peace, and praying his dis-

charge. The Supreme Court denied his application, and remanded him to the custody of the sheriff, whereupon he sued out this writ of error, assigning the unconstitutionality of the law.

In the second case the complaint alleged the unlawful employment by Holden of one William Hooley to work and labor in a certain concentrating mill, the same being an institution for the reduction of ores, for the period of twelve hours per day. The proceedings in this case were precisely the same as in the prior case, and it was admitted that there was no distinction in principle between the two cases.

*Mr. Jeremiah M. Wilson* for plaintiff in error. *Mr. C. W. Bennett, Mr. R. Harkness, Mr. A. Howat* and *Mr. W. M. Bradley* were on his brief.

In both of these cases is involved the constitutionality of the same statute of Utah, the only difference being that in the first the defendant Holden was convicted of a violation of section one of said act, while in the latter he was prosecuted and convicted under the second section. We will, therefore, consider them together, referring in the following statement to the record in the first case.

I. The statute of Utah involved herein is in conflict with the Constitution of the United States, and is not a valid exercise of the police power of the State.

Before presenting our views in detail concerning the repugnance of this statute to the Constitution of the United States, and to the various clauses of the Fourteenth Amendment which we think applicable to the matter in controversy, we deem it appropriate to ask the attention of the court, at the outset, to some of the most conspicuous of the authorities bearing upon the general question as to the scope of this police power, and as to the subjects relating to which it may properly be invoked.

(*a.*) We have not found in any of the text-books or cases an authoritative statement defining and limiting the exact

scope and range of this power.  In fact, this court itself, in
the case of *Stone* v. *Mississippi*, 101 U. S. 814, has declined
to specifically define it; but in the case of *New York* v. *Miln*,
11 Pet. 102, 139, will be found probably as concise and com-
prehensive a general definition of the term as could be given.
The court says:

" We are aware that it is at all times difficult to define any
subject with proper precision and accuracy.  If this be so in
general, it is emphatically so in relation to a subject so diversi-
fied and multifarious as the one which we are now consider-
ing [the police power].  If we were to attempt it, we should
say that every law came within this description which con-
cerned the welfare of the whole people of a State, or any
individual within it; whether it related to their rights or their
duties; whether it respected them as men or as citizens of the
State; whether in their public or private relations; whether
it related to the rights of persons or of property, of the whole
people of a State or of any individual within it."

The court, however, is careful to add that this jurisdiction
or power can only be exercised where it is not " surrendered
or restrained by the Constitution of the United States."

See also *Lake View* v. *Rose Hill Cemetery Co.*, 70 Illinois,
191; *Commonwealth* v. *Alger*, 7 Cushing, 53, 84; *Railroad Com-
pany* v. *Husen*, 95 U. S. 465; *State* v. *Noyes*, 47 Maine, 189,
211; *Thorpe* v. *Rutland & Burlington Railroad*, 27 Vermont,
149; *In re Jacobs*, 98 N. Y. 98, 107; *Austin* v. *Murray*, 16
Pick. 121, 126; *Watertown* v. *Mayo*, 109 Mass. 315, 319; *Coe* v.
*Schultz*, 47 Barb. 64; *In re Cheesebrough*, 78 N. Y. 232.

To be valid, legislation enacted for the purpose of pro-
moting the public health, morals or welfare must be of such
a character that it will affect and be for the benefit of the
whole community, or at least the part of it which is brought
into contact with the evils sought to be remedied.  Such an
enactment must not be so limited in its terms that it can and
will, as in the present case, operate upon but one of many
classes of employers and employés of the same general descrip-
tion, living and doing business under the same general condi-
tions, even though the occupation in which they are engaged

may be injurious to themselves. In other words, it must relate and have reference to the result to the health and welfare of the community of the act or omission or the condition sought to be prevented or remedied, and not to the result of such act or omission to the author or person who is responsible for such condition or engaged in the dangerous or injurious occupation — that is, provided such person is *sui juris* and does not come within the class of persons (such as women, children, etc.) over which, as has been held in some of the States, the State has the right, to a limited extent, to exercise control for their own good and welfare, and thus indirectly for the welfare of the public.

It is, therefore, not within the power of the legislature to prevent persons who are *sui juris*, and otherwise perfectly competent to contract, from entering into employment and voluntarily making contracts in relation thereto merely because the employment in which they are to engage, although perfectly legal and proper in itself, may be considered by the legislature to be dangerous or injurious to the health of the employé; and if such right to contract cannot be prevented, it certainly cannot be restricted by the legislature to suit its own ideas of the ability of the employé to stand the physical and mental strain incident to the work. The character of the work to be performed, the number of hours a day in which the employé shall work, and the amount of compensation to be paid therefor are purely and necessarily personal matters between the parties to the contract, and are regulated by the terms thereof and by the will of the employer, influenced by considerations as to the requirements of his business and the condition of the market for his products, etc., and it is clear, as it seems to us, that so long as the employment does not interfere with the rights or health of others, the legislature cannot prevent it or regulate any of its terms.

If, for any reason, the condition of the market should become such that there was no sale or demand for the product of an iron mine, for example, and the owner, in consequence of this condition, should find that he was running his business at a loss, it would be ridiculous to say that he would

not have a perfect right to lay off some of his hands altogether, or to work them all half time, or arbitrarily to reduce the number of working hours of all to any extent he might think necessary or advisable; and if he could do that, we do not see why he could not, for the purpose of meeting an increased demand for the product of his mines and the competition from other sources, or if for any reason the condition of the market warranted it, increase the number of hours of his workmen to ten or any other number more than eight that they might be willing to work or contract with him for.

A case here directly in point is that of *In re Jacobs, supra*, where the court had under consideration a law of New York prohibiting the manufacture of cigars and the preparation of tobacco in any form in tenement houses, etc. In the opinion the court says: "To justify this law *it would not be sufficient that the use of tobacco may be injurious to some persons, or that its manufacture may be injurious to those who are engaged in its preparation and manufacture; but it would have to be injurious to the public health.*"

(*b.*) But however this may be, it is well settled that, when relating to business enterprises, the business or occupation at which such regulations are directed must be affected with a "public interest," and that the regulation must be for the protection or benefit of the public generally, as we have above contended, and not of an individual or segregated class of individuals under the circumstances we have mentioned.

This court, in the case of *Munn* v. *Illinois*, 94 U. S. 113, 126, defines the property that is subject to police regulation as follows: "Property does become clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created."

See also Cooley's Constitutional Limitations, 476, 720, (4th ed.); Tiedman's Limitation of Police Powers, §§ 178, 179.

In *United States* v. *Martin*, 94 U. S. 400, 403, in which this court was called upon to construe section 3738 of the Revised Statutes, providing that eight hours shall constitute a day's work for employés of the Government, it was held that said statute was "in the nature of a direction from a principal to his agent that eight hours is deemed to be a proper length of time for a day's labor, and that his contracts shall be based on that theory," but the court distinguishes between such a direction and the principle involved in the case at bar, as follows:

"The English statute books are full of assizes of bread and ale, commencing as early as the reign of Henry II., and regulations of labor, and many such are to be found in the statutes of the several States. It is stated by Adam Smith, as the law in his day, that in Sheffield no master cutler or weaver or hatter could have more than two apprentices at a time, and so lately as the 8th George III. an act, which remained unrepealed until 1825, was passed, prohibiting, under severe penalties, all master taylors in London, or within five miles of it, from giving, or their workmen from accepting, more than two shillings seven pence half penny a day, except in the case of general mourning." Smith's Wealth of Nations, 125, (6th Oxford edition of 1869.) "*A different theory is now almost universally adopted. Principals, so far as the law can give the power, are entitled to employ as many workmen, and at whatever degree of skill, and at whatever price they think fit, and, except in some special cases, as of children or orphans, the hours of labor and the price to be paid are left to the determination of the parties interested.* The statute of the United States does not interfere with this principle."

(*c*) From the foregoing authorities it would seem to result that an enactment of the legislature, made in pursuance of the police power of a State, or a police regulation, must be for the purpose of enforcing a duty and to punish acts or omissions which may be right or wrong according to the time, place or manner of doing them — that is, the exercise of what would otherwise be a right at a time, place or in a manner injurious to the public, is prohibited. A general criminal law is to

punish something wrong in itself, without regard to the time, place or manner of doing it, and of course such a law, whether enacted by original or delegated authority, is not a police regulation.

Therefore, the violation of the maxim *sic utere tuo ut alienum non lœdas* covers every case in which the exercise of the police power would be valid or legitimate; and we think no case of a valid police regulation can be found which will not come under this maxim, and which does not refer to the limitation of the exercise of what, under proper circumstances, would be a right, and only becomes a wrong because of its excessive exercise or consequent injury to the health, welfare or morals of the public. Police regulations are, therefore, not enacted for the purpose of punishing wrongs, as such, but to enforce duties to the public in respect to matters which can only become wrongs *sub modo.* The right to destroy property to stay a conflagration and in case of war, etc., is also distinguishable, and is based upon the maxim *salus populi, suprema lex.* So of the right of eminent domain; though exercised for a public use, it is based on compensation. In a police regulation, there is only restraint for the public welfare.

If the constitution of the State requires the legislature to enact laws respecting the health of miners and others, the law to be valid must relate to the duty of the employer to his employés in the respects we have indicated, and must not interfere with the relation of the parties that rests solely on contract.

The present law has no relation to health or safety, either of the public or the persons affected, or, if so, only in a very remote degree; while its direct and principal effect is to interfere with the rights and liberties of the contracting parties.

It is apparent that if the police power extends to matters affecting contract relations and in which the public health, etc., is in no way concerned, there is practically no limit to its exercise; and all business conducted in the States, whether of a public, *quasi*-public or strictly private nature, could be made subject to such laws regulative thereof as the legislatures of

the respective States might see fit to adopt, and the personal liberty of the citizen, secured to him by the Constitution of the United States, would be entirely subverted.

(*d*) In this connection we desire to suggest that the constitutionality of this statute must be considered in the light of its effect upon the class of persons upon whom it operates, and upon the relation of the prohibition therein contained to the general public. When this is taken into consideration, it is apparent that, even if by any possibility it could fairly be said (as was assumed and said by the court below) that the enforcement of the provision contained in said measure could be conducive to the health or welfare of the employés enumerated therein, and in that respect is not unconstitutional, still it is so flagrantly violative of the rights and liberties of the citizens affected thereby — both of the employer and the employé — that it is brought in direct conflict with the Constitution of the United States, if not of the constitution of Utah, and cannot for that reason be allowed to stand.

Therefore, even if this act can fairly be assumed to have been a measure adopted by the legislature of Utah for the protection of the health or welfare of the class of persons affected thereby, it is, nevertheless, unconstitutional, because, when actually applied, it is found to be in contravention of the principles, and destructive of the rights and liberties of the citizen to which we have above pointed. To repeat the language of this court in *Boyd* v. *United States*, 116 U. S. 616, 635, varying it slightly to suit the circumstances of this case, we have no doubt that the legislature, in enacting this statute, "was actuated by perfectly proper motives," but we presume that "the vast accumulation of public business brought before it prevented it, on a first presentation, from noticing objections which have become developed by time and the practicable application of the objectionable law."

II. The statute in question abridges privileges and immunities of the plaintiff in error to which he is entitled as a citizen of the United States.

The plaintiff in error in this case is a native-born citizen of

the United States, and was at the time of his arrest, and now is, a citizen of the State of Utah, and as such was and is entitled to all the privileges and immunities of citizens of the United States as secured to them by the Constitution.

It seems to be settled by the decisions of this court, and of many others that have had this subject under consideration, that among the privileges and immunities secured to the citizen by the Fourteenth Amendment is the right " to pursue unmolested a lawful employment in a lawful manner." *Live Stock Association* v. *Crescent City Co.*, 1 Abb. U. S. 388, 389. Incidental to this there is, of course, the further right to enter into contracts relating to the character of the services to be performed, the amount of compensation to be paid and received therefor, and the period of time or the number of hours per day required to perform such labor.

The allowance to the employer of labor, and the working-man, of perfect freedom and liberty in this respect is absolutely and manifestly essential in this age of constant progress in business affairs and of great and increasing competition, to enable the employer and laborer, alike, to maintain life and to render any legitimate employment or business in which they may be engaged successful. Whatever may be the wisdom or necessity for enacting laws restrictive of the hours of labor of women, children or orphans, or the advisability of enacting such laws with reference to the employés in the various kinds of business enterprises that are held to be affected with a public interest, it is perfectly obvious, because of their great diversity and the character and necessities of the different kinds of private business enterprises, that it would be impossible to devise a law or regulation limiting the hours of employment of such employés that would operate with any degree of equality or with anything like justice upon the employers and employés in all private business enterprises, or even those of the same general class.

In the Constitution of the State of Utah itself, this distinction is recognized, and only the hours of work of employes of the " state, county and municipal governments " are attempted to be regulated thereby, the law here in question being claimed

to have been authorized and passed under the additional provision that "the legislature shall pass laws to provide for the health and safety of employés in factories, smelters and mines." The law, however, fails to make any such provision with reference to employés in factories.

Such laws as to public employés are regarded by the courts merely as directions from a principal to his agent, and as such are held to be competent; but, in the case of private employment or labor, as so aptly stated by this court, "principals, so far as the law can give the power, are entitled to employ as many men, and of whatever degree of skill, and at whatever price, they think fit, and except in some special cases, as of children and orphans, the hours of labor and the price to be paid are left to the determination of the parties interested." *United States* v. *Martin*, 94 U. S. 400.

Applying the principle last stated to the present case, it cannot be said that an act making it a misdemeanor for a private and independent mine operator to employ his workman more than eight hours a day, except in cases of emergency where life or property is in imminent danger, and subjecting him to fine and imprisonment in consequence of a violation of such provision, does not infringe or abridge the right of both the employer and laborer, to make contracts which persons and corporations in other lines of business may make, and that it does not thus abridge the privileges and immunities so secured to them as citizens of the United States.

We refer particularly to some of the authorities supporting our contention, from which it will be seen that, while the courts do not attempt specifically and in detail to enumerate and define all of these privileges and immunities, they are practically unanimous in holding that the right to pursue, in a lawful manner, a lawful vocation or trade, unmolested by laws in any way restrictive of that right, is a privilege that is protected and secured to the citizen by the Constitution of the United States. See *Ward* v. *Maryland*, 12 Wall. 418, 430; the concurring opinions of Justice Field and of Justice Bradley in *Butchers' Union Co.* v. *Crescent City*, 111 U. S., at pages 757 and 764 respectively; the dissenting opinion of Mr. Jus-

tice Field in the *Slaughterhouse cases*, 16 Wall. 97.; *Ex parte Kubach*, 85 California, 274; *In re Eight Hour Law*, 39 Pac. Rep. 328; *In re House Bill No.* 203, 39 Pac. Rep. 431; *Leep* v. *Railway Co.*, 58 Arkansas, 407; *State* v. *Goodwill*, 33 West Virginia, 179; *Wally* v. *Kennedy*, 2 Yerg. 554; *People* v. *Otis*, 90 N. Y. 48; *Godcharles* v. *Wigeman*, 113 Penn. St. 431; *Commonwealth* v. *Perry*, 155 Mass. 117; *In re Jacobs*, 98 N. Y. 98; *Shaver* v. *Pennsylvania Company*, 71 Fed. Rep. 931; *People* v. *Marx*, 99 N. Y. 377; *People* v. *Gillson*, 109 N. Y. 389; *Millett* v. *People*, 117 Illinois, 294; *In re Tiburcio Parrott*, 1 Fed. Rep. 481; *Low* v. *Rees Printing Co.*, 41 Nebraska, 127; *Frorer* v. *People*, 141 Illinois, 171.

III. This statute also violates the provision of the Fourteenth Amendment that no State shall deprive any person of life, liberty or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws.

It is not necessary here to enter upon any extended analysis of the provisions of the statute in question for the purpose of showing how unequally it affects, and how it discriminates against, all citizens of the State of Utah who are engaged in the business of mining, smelting, etc. This has already been done in what we have said under the head of police power. What we have already said is sufficient to show that, under the operation of the law, all other persons in the State, no matter in what business or occupation they may be engaged, are left entirely at liberty to make whatever contracts they please in respect of the character of the work to be performed, the amount to be paid therefor, and the number of hours that shall constitute a day's work in all occupations which by the law of the land are properly the subjects of contract.

The act in the case at bar, in sections 1 and 2, says that eight hours shall constitute a day's work only for those who are employed in underground mines or workings, smelters and other institutions for the reduction or refining of ores, and, in section 3, says that "any person, body corporate, agent, manager or employer who shall violate any of the provisions of sections 1 and 2 of this act shall be deemed

guilty of a misdemeanor." This comparatively small class of people is in terms singled out by the legislature, made to bear this unjustifiable and unequal burden, and deprived of liberties and rights of property that are enjoyed by every other citizen in the State who is engaged in any of the vast number of employments not enumerated in the act, and which by the law of the land they are protected in the enjoyment of and have the right in the courts to enforce.

This free and unrestricted right to engage in any calling that is permitted under the law, and to make necessary and lawful contracts with reference thereto, is one of the fundamental and inalienable rights of the citizen, without which, of course, no condition of social, commercial or financial prosperity could exist in a community or State that is in any way dependent on other communities or States for an interchange of commodities or commerce, and " must, therefore, be free in this country to all alike upon the same conditions. The right to pursue ' such callings ' without let or hinderance, except that which is applied to all persons of the same age, sex and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright, for ' the property which every man has is his own labor, and, as it is the original foundation of all other property, so it is the most sacred and inviolable.' " Adam Smith's Wealth of Nations, Book 1, c. 10. See also *Brown* v. *Maryland,* 12 Wheat. 419, 439; *Boyd* v. *United States,* 116 U. S. 616, 635; *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 276; Mr. Webster's Argument in *Dartmouth College* v. *Woodward,* 4 Wheat. 517, 581, 582; *Millett* v. *People,* 117 Illinois, 294; *In re Jacobs,* 98 N. Y. 98, 105; *Bertholf* v. *O'Reilly,* 74 N. Y. 509, 515; *Low* v. *Rees Printing Co.,* 41 Nebraska, 127, 136; *Ritchie* v. *People,* 155 Illinois, 98; *Frorer* v. *People,* 141 Illinois, 171; *Braceville Coal Co.* v. *People,* 155 Illinois, 98; *State* v. *Loomis,* 115 Missouri, 307; *Austen* v. *Murray,* 16 Pick. 121.

An examination of the cases cited will show that in Colorado, Nebraska, California and Illinois, laws substantially similar to that in question in the case at bar have been held

unconstitutional and void by the highest courts of those States, and that in Massachusetts, New York, Pennsylvania, Illinois, Ohio, Missouri, West Virginia, Maryland, Arkansas, Texas, Vermont and many of the remaining States of the Union, laws so nearly analogous in principle to this statute that we deem them conclusive of the question, have likewise been so held.

Indeed, the three essential and indispensable elements of that perfectly free and unrestricted right of the citizen to contract with reference to all lawful pursuits in which he may desire to engage, which is guaranteed and protected by the Constitution of the United States, and to which we have above pointed, namely, the right of the employer and the employé to agree upon (1) the character of the services to be performed, (2) the amount to be paid for such service, and (3) the number of hours per day during which the service is to continue, are constantly grouped together in the authorities, and are manifestly so inseparably connected with each other that the destruction or abridgment of one is a destruction or abridgment of the whole of said right of contract; and, therefore, any decision holding that such destruction or abridgment of one of these elements is unconstitutional must necessarily apply to and control all questions as to the constitutionality of the others.

We have nowhere found a decision of any court upholding such a law as the one here involved, or any law analogous thereto, except in the cases we have enumerated, and which we contend are clearly distinguishable from the present case, namely, (*a*) cases where the law was enacted for the purpose of limiting the hours of employment of public employés, in which case this court has held that such a law is valid because merely in the nature of a direction from a principal to his agent, (*b*) cases where such laws are enacted with regard to employments affected with a public interest, and (*c*) in the case of statutes which, although limiting the hours of employment, are enacted for the protection of the health or safety of women, children, insane persons and the like, which last are generally, though not universally, regarded as a valid

exercise of the police power for the reasons we have already stated.

Relying, therefore, upon these authorities, and upon the indication of the opinion of this court above quoted from the case of the *United States* v. *Martin*, 94 U. S. 400, we respectfully submit that the judgment and order of the court below remanding plaintiff in error to the custody of the defendant, and denying his discharge from such custody, should be reversed.

*Mr. Charles J. Pence* for defendant in error. *Mr. John H. Murphy* was on his brief.

MR. JUSTICE BROWN, after making the above statement, delivered the opinion of the court.

This case involves the constitutionality of an act of the legislature of Utah, of March 30, 1896, c. 72, entitled "An act regulating the hours of employment in underground mines and in smelters and ore reduction works." Session Laws of Utah, 1896, p. 219. The following are the material provisions:

"SEC. 1. The period of employment of workingmen in all underground mines or workings shall be eight hours per day, except in cases of emergency where life or property is in imminent danger.

"SEC. 2. The period of employment of workingmen in smelters and all other institutions for the reduction or refining of ores or metals shall be eight hours per day, except in cases of emergency where life or property is in imminent danger.

"SEC. 3. Any person, body corporate, agent, manager or employer, who shall violate any of the provisions of sections one and two of this act, shall be guilty of a misdemeanor."

The Supreme Court of Utah was of opinion that if authority in the legislature were needed for the enactment of the statute in question, it was found in that part of article 16 of the constitution of the State, which declared that " the legislature shall

pass laws to provide for the health and safety of employés in factories, smelters and mines." As the article deals exclusively with the rights of labor, it is here reproduced in full as exhibiting the authority under which the legislature acted, ánd as throwing light upon its intention in enacting the statute in question.

" Sec. 1. The rights of labor shall have just protection through laws calculated to promote the industrial welfare of the State.

" Sec. 2. The legislature shall provide by law for a board of labor, conciliation and arbitration which shall fairly represent the interests of both capital and labor. The board shall perform duties and receive compensation as prescribed by law.

" Sec. 3. The legislature shall prohibit:

" 1. The employment of women, or of children under the age of fourteen years, in underground mines.

" 2. The contracting of convict labor.

" 3. The labor of convicts outside prison grounds, except on public works under the direct control of the State.

" 4. The political and commercial control of employés.

" Sec. 4. The exchange of blacklists by railroad companies, or other corporations, associations or persons is prohibited.

" Sec. 5. The right of action to recover damages for injuries resulting in death shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation.

" Sec. 6. Eight hours shall constitute a day's work on all works or undertakings carried on or aided by the State, county or municipal governments; and the legislature shall pass laws to provide for the health and safety of employés in factories, smelters and mines.

" Sec. 7. The legislature, by appropriate legislation, shall provide for the enforcement of the provisions of this article."

The validity of the statute in question is, however, challenged upon the ground of an alleged violation of the Fourteenth Amendment to the Constitution of the United States, in that it abridges the privileges or immunities of citizens of the United States; deprives both the employer and the

laborer of his property without due process of law, and denies to them the equal protection of the laws. As the three questions of abridging their immunities, depriving them of their property, and denying them the protection of the laws, are so connected that the authorities upon each are, to a greater or less extent, pertinent to the others, they may properly be considered together.

Prior to the adoption of the Fourteenth Amendment there was a similar provision against deprivation of life, liberty or property without due process of law incorporated in the Fifth Amendment; but as the first eight amendments to the Constitution were obligatory only upon Congress, the decisions of this court under this amendment have but a partial application to the Fourteenth Amendment, which operates only upon the action of the several States. The Fourteenth Amendment, which was finally adopted July 28, 1868, largely expanded the power of the Federal courts and Congress, and for the first time authorized the former to declare invalid all laws and judicial decisions of the States abridging the rights of citizens or denying them the benefit of due process of law.

This amendment was first called to the attention of this court in 1872, in an attack upon the constitutionality of a law of the State of Louisiana, passed in 1869, vesting in a slaughter-house company therein named the sole and exclusive privilege of conducting and carrying on a live-stock landing and slaughter-house business, within certain limits specified in the act, and requiring all animals intended for sale and slaughter to be landed at their wharves or landing places. *Slaughter-house cases*, 16 Wall. 36. While the court in that case recognized the fact that the primary object of this amendment was to secure to the colored race, then recently emancipated, the full enjoyment of their freedom, the further fact that it was not restricted to that purpose was admitted both in the prevailing and dissenting opinions, and the validity of the act was sustained as a proper police regulation for the health and comfort of the people. A majority of the cases which have since arisen have turned not upon a denial to the colored race of rights therein secured to them, but upon alleged discrimina-

tions in matters entirely outside of the political relations of the parties aggrieved.

These cases may be divided, generally, into two classes: First, where a state legislature, or a state court, is alleged to have unjustly discriminated in favor of or against a particular individual or class of individuals, as distinguished from the rest of the community, or denied them the benefit of due process of law; second, where the legislature has changed its general system of jurisprudence by abolishing what had been previously considered necessary to the proper administration of justice, or the protection of the individual.

Among those of the first class, which, for the sake of brevity, may be termed unjust discriminations, are those wherein the colored race was alleged to have been denied the right of representation upon juries, *Strauder* v. *West Virginia,* 100 U. S. 303; *Virginia* v. *Rives,* 100 U. S. 313; *Ex parte Virginia,* 100 U. S. 339; *Neal* v. *Delaware,* 103 U. S. 370; *Bush* v. *Kentucky,* 107 U. S. 110; *Gibson* v. *Mississippi,* 162 U. S. 565; as well as those wherein the State was charged with oppressing and unduly discriminating against persons of the Chinese race, *Barbier* v. *Connolly,* 113 U. S. 27; *Soon Hing* v. *Crowley,* 113 U. S. 703; *Yick Wo* v. *Hopkins,* 118 U. S. 356, and *Chy Lung* v. *Freeman,* 92 U. S. 275; and those wherein it was sought under this amendment to enforce the right of women to suffrage and to admission to the learned professions, *Minor* v. *Happersett,* 21 Wall. 162; *Bradwell* v. *The State,* 16 Wall. 130.

To this class are also referable all those cases wherein the state courts were alleged to have denied to particular individuals the benefit of due process of law secured to them by the statutes of the State, *In re Converse,* 137 U. S. 624; *Arrowsmith* v. *Harmoning,* 118 U. S. 194, as well as that other large class, to be more specifically mentioned hereafter, wherein the state legislature was charged with having transcended its proper police power in assuming to legislate for the health or morals of the community.

Cases arising under the second class, wherein a State has chosen to change its methods of trial to meet a popular de-

mand for simpler and more expeditious forms of administering justice, are much less numerous, though of even greater importance, than the others. A reference to a few of these cases may not be inappropriate in this connection. Thus, in *Walker v. Sauvinet*, 92 U. S. 90, which was an action brought by a colored man against the keeper of a coffee-house in New Orleans for refusing him refreshments in violation of the constitution of the State securing to the colored race equal rights and privileges in such cases, a statute of the State provided that such cases should be tried by jury, if either party demanded it, but if the jury failed to agree the case should be submitted to the judge, who should decide the same. It was held that a trial by jury was not a privilege or immunity of citizenship which the States were forbidden to abridge, but the requirement of due process of law was met if the trial was had according to the settled course of judicial proceedings. "Due process of law," said Chief Justice Waite, "is process due according to the law of the land. This process in the States is regulated by the law of the State." This law was held not to be in conflict with the Constitution of the United States.

Similar rulings with regard to the necessity of a jury, or of a judicial trial in special proceedings, were made in *Kennard v. Louisiana*, 92 U. S. 480; *McMillen v. Anderson*, 95 U. S. 37; *Davidson v. New Orleans*, 96 U. S. 97; *Walston v. Nevin*, 128 U. S. 578 ; *Ex parte Wall*, 107 U. S. 265.

In *Hurtado v. California*, 110 U. S. 516, it was held that due process of law did not necessarily require an indictment by a grand jury in a prosecution by a State for murder. The constitution of California authorized prosecutions for felonies by information, after examination and commitment by a magistrate, without an indictment by a grand jury, in the discretion of the legislature. It was held that conviction upon such an information, followed by sentence of death, was not illegal under the Fourteenth Amendment.

In *Hayes v. Missouri*, 120 U. S. 68, it was held that a statute of a State which provided that, in capital cases, in cities having a population of over 100,000 inhabitants, the State

shall be allowed fifteen peremptory challenges to jurors, while elsewhere in the State it was allowed only eight peremptory challenges, did not deny to a person tried for murder, in a city containing over 100,000 inhabitants, the equal protection of the laws enjoined by the Fourteenth Amendment, and that there was no error in refusing to limit the State's peremptory challenges to eight.

In *Missouri Railway Co.* v. *Mackey*, 127 U. S. 205, it was said that a statute in Kansas abolishing the fellow-servant doctrine as applied to railway accidents, did not deny to railroads the equal protection of the laws, and was not in conflict with the Fourteenth Amendment. The same ruling was made with reference to statutes requiring railways to erect and maintain fences and cattle-guards, and make them liable in double the amount of damages claimed for the want of them.

In *Hallinger* v. *Davis*, 146 U. S. 314, it was held that a state statute conferring upon an accused person the right to waive a trial by jury and to elect to be tried by the court, and conferring power upon the court to try the accused in such case, was not a violation of the due process clause of the Fourteenth Amendment.

So, in *In re Kemmler*, 136 U. S. 436, it was held that the law providing for capital punishment by electricity was not repugnant to this amendment. And in *Duncan* v. *Missouri*, 152 U. S. 377, it was said that the prescribing of different modes of procedure and the abolition of courts, and the creation of new ones, leaving untouched all the substantial protections with which the existing law surrounds persons accused of crime, are not considered within the constitutional inhibition. See also *Medley, Petitioner*, 134 U. S. 160, and *Holden* v. *Minnesota*, 137 U. S. 483.

An examination of both these classes of cases under the Fourteenth Amendment will demonstrate that, in passing upon the validity of state legislation under that amendment, this court has not failed to recognize the fact that the law is, to a certain extent, a progressive science; that in some of the States methods of procedure, which at the time the Constitu-

tion was adopted were deemed essential to the protection and safety of the people, or to the liberty of the citizen, have been found to be no longer necessary; that restrictions which had formerly been laid upon the conduct of individuals, or of classes of individuals, had proved detrimental to their interests; while, upon the other hand, certain other classes of persons, particularly those engaged in dangerous or unhealthful employments, have been found to be in need of additional protection. Even before the adoption of the Constitution, much had been done toward mitigating the severity of the common law, particularly in the administration of its criminal branch. The number of capital crimes, in this country at least, had been largely decreased. Trial by ordeal and by battle had never existed here, and had fallen into disuse in England. The earlier practice of the common law, which denied the benefit of witnesses to a person accused of felony, had been abolished by statute, though so far as it deprived him of the assistance of counsel and compulsory process for the attendance of his witnesses, it had not been changed in England. But to the credit of her American colonies, let it be said that so oppressive a doctrine had never obtained a foothold there.

The present century has originated legal reforms of no less importance. The whole fabric of special pleading, once thought to be necessary to the elimination of the real issue between the parties, has crumbled to pieces. The ancient tenures of real estate have been largely swept away, and land is now transferred almost as easily and cheaply as personal property. Married women have been emancipated from the control of their husbands and placed upon a practical equality with them with respect to the acquisition, possession and transmission of property. Imprisonment for debt has been abolished. Exemptions from execution have been largely added to, and in most of the States homesteads are rendered incapable of seizure and sale upon forced process. Witnesses are no longer incompetent by reason of interest, even though they be parties to the litigation. Indictments have been simplified, and an indictment for the most serious of crimes is now the simplest of all. In several of the States grand

juries, formerly the only safeguard against a malicious prosecution, have been largely abolished, and in others the rule of unanimity, so far as applied to civil cases, has given way to verdicts rendered by a three fourths majority. This case does not call for an expression of opinion as to the wisdom of these changes, or their validity under the Fourteenth Amendment, although the substitution of prosecution by information in lieu of indictment was recognized as valid in *Hurtado* v. *California,* 110 U. S. 516. They are mentioned only for the purpose of calling attention to the probability that other changes of no less importance may be made in the future, and that while the cardinal principles of justice are immutable, the methods by which justice is administered are subject to constant fluctuation, and that the Constitution of the United States, which is necessarily and to a large extent inflexible and exceedingly difficult of amendment, should not be so construed as to deprive the States of the power to so amend their laws as to make them conform to the wishes of the citizens as they may deem best for the public welfare without bringing them into conflict with the supreme law of the land.

Of course, it is impossible to forecast the character or extent of these changes, but in view of the fact that from the day Magna Charta was signed to the present moment, amendments to the structure of the law have been made with increasing frequency, it is impossible to suppose that they will not continue, and the law be forced to adapt itself to new conditions of society, and, particularly, to the new relations between employers and employés, as they arise.

Similar views have been heretofore expressed by this court. Thus in the case of *Missouri* v. *Lewis,* 101 U. S. 22, 31, it was said by Mr. Justice Bradley : " We might go still further and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its methods of procedure for the rest of the

State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. . . . The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each State prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several States without violating the equality clause in the Fourteenth Amendment, there is no solid reason why there may not be such diversities in different parts of the same State."

The same subject was also elaborately discussed by Mr. Justice Matthews in delivering the opinion of this court in *Hurtado* v. *California,* 110 U. S. 516, 530 : " This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law. . . . The Constitution of the United States was ordained, it is true, by descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues. And while we take just pride in the principles and institutions of common law, we are not to forget that in lands where other systems of jurisprudence prevail, the ideas and processes of civil justice are also not unknown. Due process of law, in spite of the absolutism of continental governments, is not alien to that code which survived the Roman Empire as the foundation of modern civilization in Europe, and which has given us that fundamental maxim of distributive justice — *suum cuique tribuere.* There is nothing in *Magna Charta,* rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we

are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms." We have seen no reason to doubt the soundness of these views. In the future growth of the nation, as heretofore, it is not impossible that Congress may see fit to annex territories whose jurisprudence is that of the civil law. One of the considerations moving to such annexation might be the very fact that the territory so annexed should enter the Union with its traditions, laws and systems of administration unchanged. It would be a narrow construction of the Constitution to require them to abandon these, or to substitute for a system, which represented the growth of generations of inhabitants, a jurisprudence with which they had had no previous acquaintance or sympathy.

We do not wish, however, to be understood as holding that this power is unlimited. While the people of each State may doubtless adopt such systems of laws as best conform to their own traditions and customs, the people of the entire country have laid down in the Constitution of the United States certain fundamental principles to which each member of the Union is bound to accede as a condition of its admission as a State. Thus, the United States are bound to guarantee to each State a republican form of government, and the tenth section of the first article contains certain other specified limitations upon the power of the several States, the object of which was to secure to Congress paramount authority with respect to matters of universal concern. In addition, the Fourteenth Amendment contains a sweeping provision forbidding the States from abridging the privileges and immunities of citizens of the United States, and denying them the benefit of due process or equal protection of the laws.

This court has never attempted to define with precision the words " due process of law," nor is it necessary to do so in this case. It is sufficient to say that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard,

as that no man shall be condemned in his person or property without due notice and an opportunity of being heard in his defence. What shall constitute due process of law was perhaps as well stated by Mr. Justice Curtis in *Murray's Lessees* v. *Hoboken Land Co.*, 18 How. 272, 276, as anywhere. He said : "The Constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the Government, and cannot be so construed as to leave Congress free to make any process 'due process of law,' by its mere will. To what principles, then, are we to resort to ascertain whether this process, enacted by Congress, is due process? To this the answer must be twofold. We must examine the Constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country."

It was said by Mr. Justice Miller, in delivering the opinion of this court in *Davidson* v. *New Orleans*, 96 U. S. 97, that the words "law of the land," as used in Magna Charta, implied a conformity with the "ancient and customary laws of the English people," and that it was wiser to ascertain their intent and application by the "gradual process of judicial inclusion and exclusion as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." Recognizing the difficulty in defining, with exactness, the phrase "due process of law," it is certain that these words imply a conformity with natural and inherent principles of justice, and forbid that one man's property, or right to property, shall be taken for the benefit of another, or for the benefit of the State, without compensation; and that

no one shall be condemned in his person or property without an opportunity of being heard in his own defence.

As the possession of property, of which a person cannot be deprived, doubtless implies that such property may be acquired, it is safe to say that a state law which undertakes to deprive any class of persons of the general power to acquire property would also be obnoxious to the same provision. Indeed, we may go a step further, and say that, as property can only be legally acquired as between living persons by contract, a general prohibition against entering into contracts with respect to property, or having as their object the acquisition of property, would be equally invalid.

The latest utterance of this court upon this subject is contained in the case of *Allgeyer* v. *Louisiana*, 165 U. S. 578, 591, in which it was held that an act of Louisiana which prohibited individuals within the State from making contracts of insurance with corporations doing business in New York, was a violation of the Fourteenth Amendment. In delivering the opinion of the court, Mr. Justice Peckham remarked : " In the privilege of pursuing an ordinary calling or trade, and of acquiring, holding and selling property, must be embraced the right to make all proper contracts in relation thereto, and, although it may be conceded that this right to contract in relation to persons or property, or to do business within the jurisdiction of the State, may be regulated and sometimes prohibited, when the contracts or business conflict with the policy of the State as contained in its statutes, yet the power does not and cannot extend to prohibiting a citizen from making contracts of the nature involved in this case outside of the limits and jurisdiction of the State, and which are also to be performed outside of such jurisdiction."

This right of contract, however, is itself subject to certain limitations which the State may lawfully impose in the exercise of its police powers. While this power is inherent in all governments, it has doubtless been greatly expanded in its application during the past century, owing to an enormous increase in the number of occupations which are dangerous, or so far detrimental to the health of employés as to demand

special precautions for their well-being and protection, or the safety of adjacent property. While this court has held, notably in the cases *Davidson* v. *New Orleans*, 96 U. S. 97, and *Yick Wo* v. *Hopkins*, 118 U. S. 356, that the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may be lawfully resorted to for the purpose of preserving the public health, safety or morals, or the abatement of public nuisances, and a large discretion "is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests." *Lawton* v. *Steele*, 152 U. S. 133, 136.

The extent and limitations upon this power are admirably stated by Chief Justice Shaw in the following extract from his opinion in *Commonwealth* v. *Alger*, 7 Cush. 53, 84:

"We think it a settled principle, growing out of the nature of well ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that its use may be so regulated, that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this Commonwealth, as well that in the interior as that bordering on tide waters, is derived directly or indirectly from the Government, and held subject to those general regulations, which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient."

This power legitimately exercised can neither be limited by contract nor bartered away by legislation.

While this power is necessarily inherent in every form of government, it was, prior to the adoption of the Constitution, but sparingly used in this country. As we were then almost

purely an agricultural people, the occasion for any special protection of a particular class did not exist. Certain profitable employments, such as lotteries and the sale of intoxicating liquors, which were then considered to be legitimate, have since fallen under the ban of public opinion, and are now either altogether prohibited, or made subject to stringent police regulations. The power to do this has been repeatedly affirmed by this court. *Stone* v. *Mississippi*, 101 U. S. 814; *Douglas* v. *Kentucky*, 168 U. S. 488; *Giozza* v. *Tiernan*, 148 U. S. 657; *Kidd* v. *Pearson*, 128 U. S. 1; *Crowley* v. *Christensen*, 137 U. S. 86.

While the business of mining coal and manufacturing iron began in Pennsylvania as early as 1716, and in Virginia, North Carolina and Massachusetts even earlier than this, both mining and manufacturing were carried on in such a limited way and by such primitive methods that no special laws were considered necessary, prior to the adoption of the Constitution, for the protection of the operatives; but, in the vast proportions which these industries have since assumed, it has been found that they can no longer be carried on with due regard to the safety and health of those engaged in them, without special protection against the dangers necessarily incident to these employments. In consequence of this, laws have been enacted in most of the States designed to meet these exigencies and to secure the safety of persons peculiarly exposed to these dangers. Within this general category are ordinances providing for fire escapes for hotels, theatres, factories and other large buildings, a municipal inspection of boilers, and appliances designed to secure passengers upon railways and steamboats against the dangers necessarily incident to these methods of transportation. In States where manufacturing is carried on to a large extent, provision is made for the protection of dangerous machinery against accidental contact, for the cleanliness and ventilation of working rooms, for the guarding of well holes, stairways, elevator shafts and for the employment of sanitary appliances. In others, where mining is the principal industry, special provision is made for the shoring up of dangerous walls, for ventilation shafts, bore holes, escapement shafts, means of signalling the surface, for

the supply of fresh air and the elimination, as far as possible, of dangerous gases, for safe means of hoisting and lowering cages, for a limitation upon the number of persons permitted to enter a cage, that cages shall be covered, and that there shall be fences and gates around the top of shafts, besides other similar precautions. Digest of Stats. of Arkansas, 1149; California, Stats. March 16, 1872, c. 305; March 27, 1874, c. 498; March 14, 1881, c. 72; March 8, 1893, c. 74; Colorado, Mills' Anno. Stats. v. 3 Sup. c. 85; Gen. Stats. of Conn. 1888, secs. 2645 to 2647, 2263 to 2272; Rev. Stats. Illinois, 1889, p. 980; Thornton's Indiana Stats. 1897, c. 98, p. 1652; Gen. Stats. of Kansas, 1897, vol. 2, pp. 813 to 824; Kentucky Stats. (Barbour & Carroll) c. 88, p. 951; Mass. Acts May 21, 1891, c. 350; March 19, 1892, c. 83; April 25, 1892, c. 210; June 8, 1892, c. 352; June 11, 1892, c. 357; June 3, 1893, c. 406; June 22, 1894, c. 508; March 16, 1895, c. 129; Michigan (Howells' Anno. Stats.), secs. 9209b *et seq.;* Gen. Stats. of New Jersey, v. 2, pp. 1900 *et seq.;* Rev. Stat. Code and Gen. Laws of New York, vol. 2, p. 2069; Brightley's Purdon's Digest, Sup. Pennsylvania, 1885–1887, pp. 2241 *et seq.*

These statutes have been repeatedly enforced by the courts of the several States; their validity assumed, and, so far as we are informed, they have been uniformly held to be constitutional.

In *Daniels* v. *Hilgard*, 77 Illinois, 640, it was held that the legislature had power under the Constitution to establish reasonable police regulations for the operating of mines and collieries, and that an act providing for the health and safety of persons employed in coal mines, which required the owner or agent of every coal mine or colliery employing ten men or more, to make or cause to be made an accurate map or plan of the workings of such coal mine or colliery, was not unconstitutional; and that the question whether certain requirements are a part of a system of police regulations adopted to aid in the protection of life and health, was properly one of legislative determination, and that a court should not lightly interfere with such determination unless the legislature had manifestly transcended its province. See also *Litchfield Coal Co.* v. *Taylor*, 81 Illinois, 590.

In *Commonwealth* v. *Bonnell et al.*, 8 Phila. 534, a law,

providing for the ventilation of coal mines, for speaking tubes and the protection of cages, was held to be constitutional and subject to strict enforcement. *Commonwealth* v. *Conyngham*, 66 Penn. St. 99; *Durant* v. *Lexington Coal Mining Co.*, 97 Missouri, 62.

But if it be within the power of a legislature to adopt such means for the protection of the lives of its citizens, it is difficult to see why precautions may not also be adopted for the protection of their health and morals. It is as much for the interest of the State that the public health should be preserved as that life should be made secure. With this end in view quarantine laws have been enacted in most if not all of the States; insane asylums, public hospitals and institutions for the care and education of the blind established, and special measures taken for the exclusion of infected cattle, rags and decayed fruit. In other States laws have been enacted limiting the hours during which women and children shall be employed in factories; and while their constitutionality, at least as applied to women, has been doubted in some of the States, they have been generally upheld. Thus, in the case of *Commonwealth* v. *Hamilton Manufacturing Co.*, 120 Mass. 383, it was held that a statute prohibiting the employment of all persons under the age of eighteen, and of all women laboring in any manufacturing establishment more than sixty hours per week, violates no contract of the Commonwealth implied in the granting of a charter to a manufacturing company nor any right reserved under the Constitution to any individual citizen, and may be maintained as a health or police regulation.

Upon the principles above stated, we think the act in question may be sustained as a valid exercise of the police power of the State. The enactment does not profess to limit the hours of all workmen, but merely those who are employed in underground mines, or in the smelting, reduction or refining of ores or metals. These employments, when too long pursued, the legislature has judged to be detrimental to the health of the employés, and, so long as there are reasonable grounds for believing that this is so, its decision upon this subject cannot be reviewed by the Federal courts.

While the general experience of mankind may justify us. in believing that men may engage in ordinary employments more than eight hours per day without injury to their health, it does not follow that labor for the same length of time is innocuous when carried on beneath the surface of the earth, where the operative is deprived of fresh air and sunlight, and is frequently subjected to foul atmosphere and a very high temperature, or to the influence of noxious gases, generated by the processes of refining or smelting.

We concur in the following observations of the Supreme Court of Utah in this connection in its opinion in No. 2:

" The conditions with respect to health of laborers in underground mines doubtless differ from those in which they labor in smelters and other reduction works on the surface. Unquestionably the atmosphere and other conditions in mines and reduction works differ. Poisonous gases, dust and impalpable substances arise and float in the air in stamp mills,. smelters and other works in which ores containing metals, combined with arsenic or other poisonous elements or agencies, are treated, reduced and refined, and there can be no doubt that prolonged effort day after day, subject to such conditions and agencies, will produce morbid, noxious and often deadly effects in the human system. Some organisms and systems will resist and endure such conditions and effects longer than others. It may be said that labor in such conditions must be performed. Granting that, the period of labor each day should be of a reasonable length. Twelve hours per day would be less injurious than fourteen, ten than twelve and eight than ten. The legislature has named eight. Such a period was deemed reasonable. . . . The law in question is confined to the protection of that class of people engaged in labor in underground mines, and in smelters and. other works wherein ores are reduced and refined. This law applies only to the classes subjected by their employment to the peculiar conditions and effects attending underground mining and work in smelters, and other works for the reduction and refining of ores. Therefore it is not necessary to discuss or decide whether the legislature can fix the hours of labor

in other employments. Though reasonable doubts may exist as to the power of the legislature to pass a law, or as to whether the law is calculated or adapted to promote the health, safety or comfort, of the people, or to secure good order or promote the general welfare, we must resolve them in favor of the right of that department of government."

The legislature has also recognized the fact, which the experience of legislators in many States has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employés, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority.

It may not be improper to suggest in this connection that although the prosecution in this case was against the employer of labor, who apparently under the statute is the only one liable, his defence is not so much that his right to contract has been infringed upon, but that the act works a peculiar hardship to his employés, whose right to labor as long as they please is alleged to be thereby violated. The argument would certainly come with better grace and greater cogency from the latter class. But the fact that both parties are of full age and competent to contract does not necessarily deprive the State of the power to interfere where the parties do not stand upon an equality, or where the public health demands that one party to the contract shall be protected against himself. "The State still retains an interest in his welfare, however reckless he may be. The whole is no greater than the sum of all the parts, and when the individual health, safety and welfare are sacrificed or neglected, the State must suffer."

We have no disposition to criticise the many authorities

which hold that state statutes restricting the hours of labor are unconstitutional. Indeed, we are not called upon to express an opinion upon this subject. It is sufficient to say of them, that they have no application to cases where the legislature had adjudged that a limitation is necessary for the preservation of the health of employés, and there are reasonable grounds for believing that such determination is supported by the facts. The question in each case is whether the legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression, or spoliation of a particular class. The distinction between these two different classes of enactments cannot be better stated than by a comparison of the views of this court found in the opinions in *Barbier* v. *Connolly*, 113 U. S. 27, and *Soon Hing* v. *Crowley*, 113 U. S. 703, with those later expressed in *Yick Wo* v. *Hopkins*, 118 U. S. 356.

We are of opinion that the act in question was a valid exercise of the police power of the State, and the judgments of the Supreme Court of Utah are, therefore,

*Affirmed.*

Mr. Justice Brewer and Mr. Justice Peckham dissented.