The plaintiff sues as holder of two notes, one for the sum of $200, payable on demand to Thomas B. Cory, dated May 1, 1899; the second for the sum of $400, payable to said Cory on demand with interest, dated July 24, 1899.
These notes were transferred for value by indorsement to the plaintiff eighteen and sixteen months, respectively, after their issue, and on each the defendant, Mrs. Bryer, wife of the maker, signed her name on the back before delivery of the notes to the payee.
The defence was that, as the notes were taken by the plaintiff so long after their issue, he took them as notes overdue and subject to equities between the parties, the special equity relied on being payments made as principal which had been credited as interest, amounting in all to enough to pay the notes with interest at the legal rate.
Upon this defence the question was whether there was an agreement on the part of Mr. Bryer to pay interest on said notes at the rate of five per cent. per month.
As to the first note, for $200, the defendant, Mrs. Bryer, was a joint maker, the note having been given prior to the negotiable instruments act, Pub. Laws cap. 674, which went into effect July 1, 1899. Carpenter v. McLaughlin, 12 R.I. 270;Perkins v. Barstow, 6 R.I. 505.
The note was taken by the plaintiff eighteen months after *Page 601 
its date. This fact, standing alone, would have made the note overdue in this State. Guckian v. Newbold, 23 R.I. 553, and cases cited.
But, unlike previous cases, this note was kept alive by continuous payments of monthly interest to the original payee, and to this plaintiff after he took the note.
Mrs. Bryer testified that she signed the note for her husband's accommodation, who has died since the trial, leaving her the sole defendant; that she expected to pay the principal as she could; that she left the payment of interest to her husband, and that any arrangement he made about the interest was satisfactory to her. Under these circumstances, the note cannot be considered as overdue at the time of transfer.
In Bacon v. Harris, 15 R.I. 599, the defendant was an accommodation maker of a note, which bore indorsements of interest paid to a time beyond the sale of the note to the plaintiff. The court held that the question should have been left to the jury whether Mrs. Harris, the defendant, knew of, assented to, or ratified such payments of interest, thereby implying that if she did the note could not be regarded as overdue.
Upon the first note the verdict for the defendant was wrong, and contrary to the substantial instructions of the court.
As to the note of $400, dated July 24, 1899, the defendant stands in a different relation. Upon this note she was an indorser. Pub. Laws 1899, cap. 674, §§ 71, 72. As indorser she was entitled to notice of dishonor. It appears from the testimony that notice was duly given to the defendant. It further appears that the note was secured by a mortgage on personal property. It was agreed that Mr. Bryer, the maker of the note, was to pay five per cent. a month to Cory, and the only question in dispute was whether this was payable as interest or as principal. Mr. Bryer testified that he was to pay five per cent. a month as principal; that no interest was agreed upon, but that he intended, after the principal was paid, to use the payee liberally as to interest. He also testified that he knew that the payee understood that he was receiving the five per cent. per month as interest; that they had conversations *Page 602 
about it when Mr. Bryer was behind in his payments, but that he said nothing because he "did not want a rupture," and that Cory gave him receipts for the payments as interest. The defendant's contention shows clearly that the notes were to run more than twenty months, unless he should pay them sooner, and, hence, that they could not be regarded as overdue when the plaintiff bought them, even if we disregard the fact that they were kept alive by the payment of interest, a fact not disputed, and as to which no contrary claim was made to the plaintiff when Mr. Bryer paid his money after the transfer and the plaintiff gave him receipts for interest.
It also shows that the maker of the notes knew that when he paid his money it was received and applied as interest, without protest on his part. He is therefore estopped from setting up afterwards that the payments were made on the principal. Draper
v. Horton, 22 R.I. 592; Pettis v. Ray, 12 R.I. 344. It cannot be assumed that the holder of the note would have allowed it to run so long if he had known that the rate of interest was disputed. Mr. Bryer evidently had doubt about this when he gave his reason for not disputing the interest that he "didn't want a rupture" and was fearful that Cory might foreclose the chattel mortgage. " A person is estopped to set up the truth in contradiction to his conduct, so as to make the truth an instrument of fraud." East Greenwich Inst. v. Kenyon,20 R.I. 110. Moreover, Mr. Bryer's claim that a man whose business was letting money at high rates of interest, even though he was a friend, would loan money for whatever the debtor might see fit to pay him, under an agreement that might run twenty months, is too contrary to common business transactions and too inconsistent with the conduct of the parties in this case to be credible.
Upon the second note, also, the verdict for the defendant was clearly against the evidence.
New trial granted.
OPINION TO THE GOVERNOR.
Under the provisions of section 3 of article X of the constitution of the State, the following opinion of the justices of the Supreme Court was delivered to the governor, June 24, 1902, in the matter of
THE TEN HOUR LAW FOR STREET RAILWAY CORPORATIONS.
(1) Constitutional Law. Amendment to Charters. Police Power.Impairing Contracts.
Pub. Laws cap. 1004, passed April 4, 1902, provides as follows:
"SECTION 1. A day's work for all conductors, gripmen, and motormen now employed or who may hereafter be employed in the operation of all street railways, of whatever motive power, in this state shall not exceed ten hours' work, to be performed within twelve consecutive hours. No officer or agent of any corporation operating street cars, of whatever motive power, in this state shall on any day exact from any of its said employees more than the said ten hours' work within the twenty-four hours of the natural day, and within twelve consecutive hours:Provided, however, that on all legal holidays, and on occasions when an unexpected contingency arises demanding more than the usual service by such street rail way corporation to the public, or from such employees to the corporation, and in case of accident or unavoidable delay, extra labor may be performed for extra compensation; and that nothing herein contained shall affect existing written contracts.
"SEC. 2. That it is the true intent and purpose of this act to limit the usual hours of labor of the employees of street railway corporations, as aforesaid, to ten hours' actual work a day, to be performed within a period of twelve consecutive hours, as aforesaid, whether such employees be employed by the trip or trips, the job, the hour, the day, the week, the month, or in any other manner."
Held, that, so far as the law affected corporations created by and subject to the legislative authority, it was sustainable as an amendment to the several charters.
Held, further, that the act dealt with public corporations, the use of a public franchise, and a provision for public safety, and was a valid exercise of the police power of the legislature.
Held, further, that the fact that the act exempted from its operation cases of existing contracts was not enough to render the act invalid, since the exemption was not obviously arbitrary, partial, or oppressive; and, except in such cases, the court will resolve a reasonable doubt in favor of the legislative action.
Held, further, that the apparent purpose of the act was not to create a right in favor of the employees which they might waive, so much as to *Page 604 
safeguard the public; hence it was illegal for a street railway company to make any contract with its employees to labor otherwise than as provided in said act.
BLODGETT, J., dissenting.
PROVIDENCE, June 24, 1902.
To His Excellency, Charles Dean Kimball, Governor of the State of Rhode Island and Providence Plantations:
We have received from your excellency the following questions, viz.:
"First. Are the provisions of Chapter 1004 of the Public Laws, passed April 4, 1902, entitled `An act to regulate the hours of labor of certain employees of street railway corporations,' or any of such provisions, in violation of the constitution of the State of Rhode Island?
"Second. If not, is there anything in the provisions of said chapter 1004 to make it illegal for a street railway corporation to make a contract with its employees to labor more than ten hours within the twenty-four hours of the natural day, and within twelve consecutive hours, except as provided in said chapter ?"
In response to these questions, we have the honor to submit the following opinion:
Chapter 1004 of the Public Laws relates to the hours of labor on street railways. It therefore relates also to the exercise of public franchises upon public streets for public accommodation.
When a law is made to affect corporations created by and subject to the legislative authority, it is held to be an amendment to the several charters and sustainable on that ground. A notable instance of this sort is found in the weekly payment law of 1891. The case of State v. Brown Sharpe Mfg. Co.,18 R.I. 16, so fully and carefully covered the scope and authority of such laws that we need not here repeat its reasoning. It was there decided that the law was not in violation of any of the constitutional provisions of the United States or of this State. The same reasoning is applicable to the statute in question, so far as it relates to corporations. *Page 605 
There is also a common assent that the legislature has the right of control in all matters affecting public safety, health, and welfare, on the ground that these are within the indefinable but unquestioned purview of what is known as the police power. It is indefinable, because none can foresee the ever-changing conditions which may call for its exercise; and it is unquestioned, because it is a necessary function of government to provide for the safety and welfare of the people. Private rights are often involved in its exercise, but a law is not on that account rendered invalid or unconstitutional. The first inquiry is whether the subject of the law is within the power; for, if it is, the legislature has jurisdiction to enact it and its terms are subject to a reasonable legislative discretion.
The constitutionality of the law under consideration may also be sustained as an exercise of the police power of the legislature. In Holden v. Hardy, 169 U.S. 366, the Supreme Court of the United States held that a statute of Utah which limited the hours of labor in mines to eight hours per day, except in cases of emergency, was a valid exercise of the police power and not in conflict with the fourteenth amendment to the constitution of the United States. That decision goes much farther than the question here presented, because the law affected cases based primarily on private contracts. The law before us is more clearly within such power, for the triple reason that it deals with public corporations, the use of a public franchise, and a provision for public safety. It has been held, in many cases, that any one of these grounds is sufficient to sustain an exercise of the police power. In answering your question, therefore, we have to look to possible objections to the details of the law rather than to the affirmative authority of its scope.
It may be objected that it infringes the right of contract; but that objection is answered, by the decision above quoted, on the ground that the police power stands above private rights in matters affecting the public welfare. Also, as stated by this court in State v. Dalton, 22 R.I. 77: "This inalienable right is trenched upon and impaired whenever the legislature prohibits a man from carrying on his own business in his own *Page 606 
way, provided always that the business and the mode of carrying it on are not injurious to the public, and provided, also, that it is not a business which is affected with a public use or interest."
The law in question is clearly within the latter proviso.
It may also be objected that this law is not a proper exercise of the power, because it exempts from its operation cases of existing written contracts.
Granting that the legislature has jurisdiction of the subject-matter, it must also be granted that it has reasonable discretion in acting upon it. All intendments will be made in favor of a law not obviously void upon its face.
As said by Mr. Justice Brewer in Atchison v. Matthews,174 U.S. 96: "It is also a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon full knowledge of the facts, and with the purpose of promoting the interests of the people as a whole, and courts will not lightly hold that an act duly passed by the legislature was one in the enactment of which it had transcended its power."
Both this court in State v. Peckham, 3 R.I. 289, and the Supreme Court of the United States in Munn v. People, 94 U.S. 113, have declared that the legislature is the exclusive judge of the propriety and necessity of legislative interference within the scope of legislative power. If a state of facts could exist which would justify legislation, it is to be presumed that it did exist.
To the same effect is the statement of Chief Justice Durfee in State v. Narragansett, 16 R.I. 424: "The rule generally laid down is that statutes should be sustained unless their unconstitutionality is clear beyond a reasonable doubt. A reasonable doubt is to be resolved in favor of the legislative action, and the act sustained."
Nevertheless, as held in Yick Wo v. Hopkins, 118 U.S. 356, a law may be invalid if it makes discriminations which are clearly unreasonable, arbitrary, oppressive, or partial.
If, however, intendments are presumed in favor of a law under the former rule, they can only be overcome under the *Page 607 
latter rule when the vice of the law is apparent on its face. A law need not state its purpose, and it seldom does. Courts are usually able to see the purpose from the terms of the act itself, and so also to see therein its arbitrary or unlawful provisions if such there be.
While there may be no obvious reason for exempting from the operation of the present statute cases of existing written contracts under which there might be as great danger to the public from the strain of excessive labor as in cases where there is no such contract, so, on the other hand, such exemption is not obviously arbitrary, partial, or oppressive. Assuming knowledge of the facts on the part of the legislature, it may be that written contracts were so few, or held by men of such experience and skill, or applicable to such conditions of labor, as to make the exemption reasonable and proper so far as the public are concerned.
It is a general rule that a law must apply equally to all of the class affected by it, and this law applies to all contracts for labor on street railroads other than those under existing written contracts. It is prospective in its operation, and as the written contracts expire it will embrace all. The mere fact that one class is not embraced in a law when it might be, is not enough of itself to render the law invalid. An example of this is found in State v. Justus, 88 N.W. Rep. 759, where the Supreme Court of Minnesota declared an act constitutional which forbade the blacklisting of discharged employees by corporations or partnerships. It was claimed that the law was unequal because it exempted individuals, and that the mischief of blacklisting by an individual was as great as that done by a corporation or partnership. But the court held that the act, being applicable to all members of the class, was not invalid because limited to that class.
It is a common thing for laws to take effect at a future date, when acts done before that date would be as great a menace to public safety as those done after it; but evidently that would not vitiate the law.
Statutes limiting the hours of labor for women and children have been very generally adopted in this country. *Page 608 
The statute relating to the practice of medicine exempts those who were honorably engaged in practice prior to January, 1892, from producing a diploma from a medical college or submitting to an examination, one of which forms of evidence of qualification is required from all others. Yet the constitutionality of the act has not been questioned on that ground.
Very many cases might be cited in which there has been considerable difference of opinion upon questions closely allied to that here presented, but we do not think it would serve a useful purpose to discuss them nor to point out differences which might tend to distinguish them. The general rules which we have quoted are sufficient to give the reasons for our conclusion, which is that the law in question does not violate any provision of the constitution of this State or of the United States in its scope and character, nor by reason of violating rights of contract, nor by reason of an apparent and arbitrary exercise of power in the exception to which we have referred. If there is any other ground upon which it may be claimed to be unconstitutional, it does not now occur to us.
The second question calls for a construction of the act with reference to the right to contract under it.
The first section forbids an officer of a company to exact
more than ten hours' work, from which an inference might arise that it could accept it if rendered voluntarily, as by contract. The second section, however, rebuts such an inference, for, in that section, the intent is explained as follows: "The true intent and purpose of this act is to limit the usual hours of labor of the employees of street railway corporations, as aforesaid, to ten hours' actual work a day, to be performed within a period of twelve consecutive hours." This express intention to limit the hours is quite inconsistent with an inference to permit it by contract. If such an inference could stand, it would be possible for parties to avoid the act by their simple consent, and thus to render it a nullity. The apparent purpose of the act is not to create a right in favor of the employees, which they might waive, so much as to guard the public safety from service too prolonged for alertness in the *Page 609 
exercise of reasonable care. If this be so, the public safety cannot be made dependent upon private contracts.
We therefore reply to the second question of your excellency that it is illegal for a street railway company to make a contract with its employees to labor more than ten hours within the twenty-four hours of the natural day, and within twelve hours, except as provided in said chapter.
Mr. Justice Douglas, being interested in one of the companies to which the act applies, deems it proper that he should not express an opinion.
(Signed)
 JOHN H. STINESS, PARDON E. TILLINGHAST, GEORGE A. WILBUR, HORATIO ROGERS, EDWARD CHURCH DUBOIS.