**HUME v. MOORE–McCORMACK LINES, Inc., et al.**

No. 294.

Circuit Court of Appeals, Second Circuit.
June 23, 1941.

Gazan & Caldwell, of New York City (Simone N. Gazan, of New York City, of counsel), for plaintiff-appellant.

Hunt, Hill & Betts, Geo. Whitefield Betts, Jr., William Logan, Jr., and Helen F. Tuohy, all of New York City, for defendant-appellee.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

Appellant was employed as a seaman on the S.S. "Zarembo", owned and operated by defendant American-West African Line, Inc., from February 13, 1940, to May 15, 1940. Subsequently, from June 6, 1940, to June 20, 1940, he was similarly employed on the SS "Mormacyork", owned and operated by defendant-appellee Moore-McCormack Lines, Inc. He seeks damages in separate causes of action against each defendant for the development of tuberculosis, or the aggravation of existing tuberculosis, by reason of each defendant's negligence in supplying improper sleeping quarters on board its vessel. In a third cause of action, he alleges joint negligence by the defendants. In all three causes of action he asks maintenance and cure, besides damages for negligence.

Both defendants moved for summary judgment on the ground that the claims had been released by plaintiff in a release to one of them, the Moore-McCormack Lines. This motion was granted as to that one defendant, and Hume appeals. According to appellee's affidavits, the circumstances of the release were these: On June 21, 1940, Hume told its claim adjuster that he had burned his hand the previous night and had been treated at a hospital. The adjuster sent him to another hospital, and twice advanced him $15 maintenance. On July 15th Hume told another adjuster for the company that he wanted $250 in full settlement of any claims he had against the company. He was told to see the company doctor and to obtain a discharge from the hospital; in the meantime, he was given $15 more for maintenance.

On July 23rd, Hume presented his hospital discharge, which read "Discharged—Fit for duty July 15, 1940." The adjuster examined the company doctor's report and, after considerable discussion, arrived at a settlement of $150, which included the $45 previously advanced. For the $105, Hume was required to sign a release substantially identical with that set out in our opin-

jon in Sitchon v. American Export Lines, Inc., 2 Cir., 113 F.2d 830, 1940. It was headed (in red print):

"Release of All Rights

*"Read Carefully*

"By signing this you give up Every right you have."

The release specified in typewriting that Hume released his claims as to "Burn 3rd degree of right hand and fingers; burn 1st degree of forehead, face, left forearm June 20, 1940," and included a printed release "even as respects injuries, illnesses, rights and claims not mentioned herein or not known to me." There are several other references to injuries which are unknown or of unknown extent. Finally, in answer to the question (printed in red) "What is this paper which you are signing?" Hume wrote "Release of everything". Hume was told, and he acknowledged that he understood, that he was releasing the company of every claim he had against it, and that "he was signing his life away."

At the time he signed the release, neither Hume nor appellee knew that he was suffering from tuberculosis. The District Court held that the release was binding, nevertheless, as to the unknown injury, having been made by Hume as "the result of full consideration, and understanding of his act in dealing at arm's length with his employer's representatives," since appellant's affidavits suggested no defense to the release except that of inadequate consideration.

The legal effect of seamen's releases has been before us recently on two important occasions; our decision here turns on the application of principles there enunciated. In Bonici v. Standard Oil Co., 2 Cir., 103 Fed.2d 437, 438, 1939, a seaman, while at work on a vessel at sea, injured his shoulder. After a week of hospital treatment, he received from his employer, the shipowner, $89.45, which was somewhat in excess of the cost of that treatment, and executed and delivered and signed a general release of all claims which he had or might have against his employer. Subsequently he had further trouble with his shoulder necessitating further hospital treatment for several months. He sued for its cost. Respondent, the shipowner, was not negligent and the vessel was not unseaworthy. The release was substantially like that before us in the instant case; it was, we said, "made as extensive as human and legal ingenuity could make it". The seaman was a person of some education, able to read and write, and knew that he was signing a general release; he did so because the doctor for the shipowner had told him that there was nothing the matter with his arm and that he would be ready to work in a few days. We held that while a seaman's release is not always inoperative, yet, it must be jealously scrutinized to see that the seaman, as one of the "wards of the admiralty", has not been overreached, and that, on the facts, a judgment in the seaman's favor, covering the cost of his additional treatment, incurred after the release, must be affirmed. In Sitchon v. American Export Lines, 2 Cir., 113 F.2d 830, 1940, the facts were substantially the same as in the Bonici case but with the important difference that the seaman, before signing the release, had had the independent advice of his own physician and his own lawyer; because of those differentiating facts, which we stressed, we affirmed a summary judgment for the defendant. We are now presented with the question whether the doctrine of the Bonici case, supra, should be applied here.

That doctrine is founded on no statute, and yet is strikingly at variance with views which have long prevailed at common law. For many decades the common-law courts have held that (absent fraud, coercion or other special circumstances) a release given, for consideration, by an adult employee to his employer must be enforced against the employee strictly according to its terms, no matter how harsh or unusual, because those terms were the result of a bargain between persons regarded by the court as equals; each party to the bargain, it was said, acted with his eyes open. Most 19th century judges would have thought that to hold otherwise would be to interfere, inconceivably, with liberty of contract. But, in that same period, the admiralty courts utilized a different rule; they guarded, with special solicitude, the rights of seamen in such dealings with their employers. In this country, the same judges who, sitting one day at common law, applied a strict doctrine to employees in general, when, the next day, they sat in admiralty, applied a more lenient doctrine to workers at sea, calling them the "wards of admiralty"; see e.g. Harden v. Gordon, Fed. Cas. No. 6,047, 1823; Brown v. Lull, Fed. Cas. No. 2,018, 1836; The David Pratt, Fed.Cas. No. 3,597, 1839; Robertson v.

Baldwin, 165 U.S. 275, 287, 17 S.Ct. 326, 41 L.Ed. 715, 1897; The James H. Shrigley, D.C., 50 F. 287, Coxe, J., 1892.[1] Contrast the attitude manifested in Lochner v. People of New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133, 1904, a non-admiralty case, with that disclosed in admiralty cases such as The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, 1902, and The Iroquois, 194 U.S. 240, 24 S. Ct. 640, 48 L.Ed. 955, 1904.

At one time there had been no such marked divergence between the common law and admiralty rules as to employees. In what we call the medieval period, the common law did not apply to workers, generally, any doctrine of "liberty of contract"; it may roughly be said—but with distinct need for qualifications[2]—that the medieval attitude, based upon feudal notions of fixed class status, stressed the relations of persons one to another, enforcing reciprocal obligations derived more from such relations than from contract. But the use of money introduced an impersonal element; as, more and more, cash became the nexus, the fixed cleavage of feudal classes and the concept of obligations founded primarily on status, began to give way. When trade increased, and, under the impact of many factors, the national, dynastic, territorial State arose, in the days of the Tudors and the first two Stuarts, to take the place of local and relatively self-sufficient units, a new set of attitudes (which had begun to emerge in the 13th and 14th centuries) found full expression in a rigorous economic nationalism which historians were later to call "mercantilism". A rising merchant class was released by centralized government from most of the ancient hampering restrictions imposed by the local governing units. The result was a vast liberation of the energies of alert individuals engaged in the pursuit of gain. This meant a substantial departure from the moral ideal of the medieval period—an ideal not always matched by the realities[3]—which had condemned the striving of the individual for wealth as one of the seven deadly sins. But the adventurous merchant was still not free to think primarily of his own advancement. The scheme of government was totalitarianoid. The highly conscious dominant notion was the welfare of the nation, regarded as an entity, to be procured by an intensive state regulation of all phases of agriculture and

---

[1] See also, The Arizona v. Anelich, 298 U.S. 110, 123, 56 S.Ct. 707, 80 L.Ed. 1075; Warner v. Goltra, 293 U.S. 155, 162, 55 S.Ct. 46, 79 L.Ed. 254, 1934; Socony-Vacuum Oil Co. v. Smith, 305 U. S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265, 1939.

[2] Goebel has shown, in his Felony and Misdemeanor (1937), and elsewhere, that the real property lawyers have glossed over the element of contract in the feudal period; that the mistaken viewpoint that there was no contract until the action of assumpsit developed, has led to a disregard of many and varied contract situations throughout the middle ages whereby the incidences of status relationships were modified, Magna Carta being a conspicuous example of a medieval contract; and that, apart from the so-called feudal contracts, there is a considerable body of law in that period that has its basis not in status but in contract, this being especially true in the borough courts. During the thirteenth and fourteenth centuries, for example, when the central courts refused to enforce oral contracts, the local courts granted enforcement; see Putnam, Enforcement of the Statute of Laborers.

[3] The ideal of the Middle Ages was noble; society was conceived of as an economic whole, a community; all activities were to be for the common weal; there was much stress on mutual obligations, on social solidarity and cooperativeness; if men sought individual gain, they must do so for the public weal, and, even so, with a suspicion that they were engaged in a task not worthy of respect. But those who make much of that ideal and contrast it with the realities of what they call an "acquisitive society", usually neglect the fact that the actualities of that era were ugly. The ideal was often forgotten in practice. "The gross facts of the social order were accepted in all their harshness and brutality," Tawney admits. It was a period of class privilege, class oppression and exploitation. The lowly were horribly treated, and led meager, miserable lives. If gain by trading was considered despicable, it was because, as Delisle Burns put it, "the saint and noble profited by those very economic relationships without thinking of them. European Medievalism confused the issue by a conception of saintliness or holiness according to which a person was excellent if he did not think of the money cost of the services he accepted from others." The suppression of medievalism meant progress: "A system of widespread payment for services is an advance upon a system of forced services accepted without thought by the privileged."

industry.[4] The energies of the striving individual were canalized so as to foster the wealth of the nation; there was a strong note of disapproval of any man who sought his own selfish advantage at the expense of public advantage. Self-interest was not, as yet, considered the prime mover; the material interests of the State were paramount. The "mercantilist" system was profoundly paternalistic (or maternalistic). Particularly was that true as to laborers. No one in Elizabeth's reign would have dreamed of suggesting that there was a complete right to freedom of contract between master and servant; as to such undertakings, notions of status, of non-contractual rights and duties, were still operative. An elaborate labor code was an integral part of the Elizabethan plan of government: Employers could not, at will, discharge their workers, nor depress their wages unduly; reciprocal obligations were imposed on workers; unemployment relief was accorded by the State, as a matter of right, with no obloquy to the recipient.[5]

Slowly, however, there evolved a belief that, if men were let alone, each to follow his own selfish aims, the social welfare would be best promoted, a belief in the supreme desirability of the freedom of the individual, in all walks of life, from all restraints in matters of industry and trade. This belief had its beginnings at least as early as the 17th century[6] and grew stronger in the 18th. It flowered in the 19th. The theory of unmitigated laissez-faire then found its secular bible in Adam Smith's Wealth of Nations, published in 1776. That secular bible, to be sure, was somewhat misinterpreted; the exegesis led sometimes to an ignoring of the actual text; for Adam Smith, unlike many of his disciples, had remained a believer in some aspects of mercantilism, as the very title of his great book indicates. But Adam Smith's central thesis—that each man, when seeking only his selfish advantage, "is led by an invisible hand to promote an end which is no part of his intention", so that individual selfishness is the best means of fostering social welfare[7]—as later revised by Ricardo & Co.,[8] and still later by Herbert Spencer, came to dominate the thinking of American legislatures and courts; in 1884 the Wealth of Nations was judicially quoted to aid in an interpretation of our constitution.[9] "Liberty of contract" became

[4] The novelty was not in the fact of intensive governmental regulation but that the regulation was on a national scale.

[5] Holdsworth, History of English Law, IV (1924) 379–407.

Holdsworth expresses some regret that subsequently there was a wholesale abandonment of the Elizabethan program; loc. cit. IV 379, 386, 387; X (1938) 23, 24; XI (1938) 499–501; II, 3d Ed. 1923; 466; VI (1924) 349, 359. It is to be noted, however, that Holdsworth intimates his own distrust of democracy; see X (1938) 23, 723, 724.

[6] Secular Calvinism has been stressed as a major influence; see Weber, The Protestant Ethic and the Spirit of Capitalism (translated 1930); Parsons, Calvin, 3 Ency. of Soc. Sciences (1930) 152; James, Protestantism, 12 Ency. of Soc. Sciences 571 (1934); this thesis, in its more pronounced form has been criticized as giving too much weight to an aspect of Calvinism which was not to manifest itself until much later; see Tawney's introduction to Weber's book; cf. Preserved Smith, The Age of the Reformation (1920), 728, 729; Wingfield-Stratford, The History of British Civilization (1928) I, 573. As to non-individualistic characteristics of Calvinism in early colonial America, see James, loc. cit.

[7] He also thought that "man's self love is God's providence". That, however, he was using this thesis as an "as if" or "abstractive fiction" has been suggested by Lange, Buckle and Vaihinger; see Vaihinger, The Philosophy of "As If" (translated by Ogden, 1925), 19, 20.

[8] Ricardo was himself not a complete Ricardian; he believed in the nationalization of the Bank of England, and supported the repeal of laws obstructing trade-union organization. But, as Wesley Mitchell says, his conclusions became the party platform of the Whigs who, later, dominated Parliament, and "a theory that gets into politics hardens into a dogma".

Bentham, of course, was also an influence, but his views did not always pull in the same direction; Dicey, Law and Opinion in England During the Nineteenth Century (2d ed. 1914), xxx note 1, 146–158, 190–205, 303–310; see especially, 308, note 1 for Spencer's attack on utilitarianism.

[9] In Butchers' Union Co. v. Crescent City Co., 111 U.S. 746, 757, 4 S.Ct. 652, 661, 28 L.Ed. 585, 1884, in a concurring opinion, Field, J., in a passage describing the inalienable rights conferred upon citizens by the 14th Amendment, remarked: "It has been well said that 'the property

the regnant theme. The right of employees freely to contract with their masters, "(all being men, sui juris), in a private business", was, said the court in Lochner v. People of New York, 198 U.S. 45, 25 S. Ct. 539, 546, 49 L.Ed. 937, 3 Ann.Cas. 1133, 1904, "part of the liberty" protected "by the * * * Constitution". There was, accordingly, "no reasonable ground for" legislative interference, by a statute limiting the hours of labor, "with the liberty of * * * free contract" of those who were employed in bakeries, for they were "able to assert their rights and care for themselves without the protecting arm of the state, interfering with their independence of judgment and of action. They are," said the court, "in no sense wards of the state."[10] Other courts, in reaching similar conclusions, said that similar legislation would be insulting to the manhood of workers, or degrading, would put them under improper guardianship, create a class of statutory laborers, and stamp them as imbeciles.[11]

There was to be a swing, later in the 20th century, away from this excessive emphasis on liberty of contract;[12] see e.g. West Coast Hotel Co. v. Parrish, 300 U.S. 379, 391-394, 57 S.Ct. 578, 581, 81 L.Ed. 703, 108 A.L.R. 1330, 1937, where the court (per Chief Justice Hughes), summarizing previous decisions, said, "The Constitution does not speak of freedom of contract. * * * [The] power under the Constitution to restrict freedom of contract has had many illustrations. That it may be exercised in the public interest with respect to contracts between employer and employee is undeniable"; the court refused to accept it as a dogma "that adult employees" must invariably "be deemed competent to make their own contracts". But clearly, at an earlier time, when legislatures were being admonished that, except in unusual circumstances, it was unconstitutional to intrude upon the inalienable right of employees to make contracts containing terms unfavorable to themselves, in bargains with their employers, the courts would not, of their own motion, venture thus to intrude. An ordinary worker was told, if he sought to avoid harsh contracts made with his employer (when fraud or the like was absent), that he had acted with his eyes open, had only himself to blame, must stand on his own feet, must take the consequences of his own folly.

A different answer was given to seamen. In The Juliana, 2 Dod. (1822) 504, Lord Stowell remarked that it would not do to say to a seaman "that it is all his own doing, and that he is thought fit to bring it upon himself by his own indiscretion in signing

which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.' [Adam] Smith, Wealth Nat. Bk. 1, c. 10".

In Lochner v. People of New York, supra, Holmes, J., dissenting, said, "The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics."

10 Liberty, it was said in Ritchie v. People, 155 Ill. 98, 40 N.E. 454, 455, 29 L.R.A.79, 46 Am.St.Rep. 315, 1895, (in holding unconstitutional a statute which limited the hours of work for women) "includes the right to acquire property. * * * Labor is property, and the laborer has the same right to sell his labor, and to contract with reference thereto, as has any other property owner. In this country the legislature has no power to prevent persons who are sui juris from making their own contracts". The privilege of employees thus to contract with employers, free of legislative interference, was among "the fundamental rights of Englishmen, brought to this country by its original settlers, and wrested, from time to time, in the progress of history, from the sovereigns of the English nation."

11 See Pound, Liberty of Contract, 18 Yale L.J. (1909) 454, 463.

12 There had been earlier deviations; see e.g. Holden v. Hardy, 169 U.S. 366, 397, 18 S.Ct. 383, 42 L.Ed. 780, 1898. Cf. L. Hand, Due Process of Law and The Eight Hour Day, 21 Harv.L.Rev. (1908) 495, 506.

In England, the swing away from complete laissez faire began earlier than in this country; see Dicey, loc. cit., xxx, 64–69, 216 ff., 264 ff., 415ff., 310. Dr. Arnold, in 1838, called laissez-faire "the falsest maxim which ever pandered to human selfishness under the name of political wisdom"; Carlyle in 1839, said it was "false, heretical, and damnable, if ever aught was".

such a contract." "To such men," he said, in The Minerva, 1 Hagg. (1825), 347, "no such response can be made, as that which is irresistibly made in other cases of contract—it is your own contract, you have signed it with your eyes open * * *." And he based the reason for such a rejection of the usual "signed-it-with-your eyes-open" standard on "the extreme disparity between the two parties" to the contract. "On the one side are gentlemen possessed of wealth, and intent, I mean not unfairly, upon augmenting it, conversant in business, and possessing the means of calling in the aid of practical and professional knowledge. On the other side is a set of men, generally ignorant and illiterate, notoriously and proverbially reckless and improvident, ill provided with the means of obtaining useful information, and almost ready to sign any instrument that may be proposed to them; and on all accounts requiring protection, even against themselves. Everybody must see where the advantages must lie between parties standing upon such unequal ground, and accordingly these special engagements so introduced into the mariners' contract lean one way, to the disadvantage of the mariners, and to the advantage of their employers, by increasing the duties of the former, and diminishing the obligations of the latter."[13]

Accordingly, when we ask why, during the 19th century, in the high noon of laissez-faire, those employed as sailors were accorded unique treatment—why judges sitting in admiralty, and without benefit of

[13] In Harden v. Gordon, supra, Mr. Justice Story (in holding invalid a stipulation limiting the shipowner's responsibility for medicine and medical care to that furnished by the medicine chest on board ship) said: "Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. * * * They are considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract, in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable. Hence every deviation from the terms of the common shipping paper (which stands upon the general doctrines of maritime law) is rigidly inspected; and if additional burthens or sacrifices are imposed upon the seamen without adequate remuneration, the court feels itself authorized to interfere and moderate or annul the stipulation." In Brown v. Lull, supra, Story, J., put it thus: "Seamen are a class of persons remarkable for their rashness, thoughtlessness and improvidence. They are generally necessitous, ignorant of the nature and extent of their own rights and privileges, and for the most part incapable of duly appreciating their value. They combine, in a singular manner, the apparent anomalies of gallantry, extravagance, profusion in expenditure, indifference to the future, credulity, which is easily won, and confidence, which is readily surprised. Hence it is, that bargains between them and shipowners, the latter being persons of great intelligence and shrewdness in business, are deemed open to much observation and scrutiny; for they involve great inequality of knowledge, of forecast, of power, and of condition. Courts of admiralty on this account are accustomed to consider seamen as peculiarly entitled to their protection; so that they have been, by a somewhat bold figure, often said to be favorites of courts of admiralty. In a just sense they are so, so far as the maintenance of their rights, and the protection of their interests against the effects of the superior skill and shrewdness of masters and owners of ships are concerned". Story admittedly was much influenced by Stowell.
In The David Pratt, supra, the court said: "Seamen * * * are usually dependent on their wages for present support, and if they are withheld they ordinarily find themselves in a state of entire destitution, not only without present means to provide for their immediate and most pressing necessities, but without credit. If their employers choose to impose upon them hard terms, they are obliged to take what is offered them to meet their immediate wants or forthwith to re-ship on another vessel. They are thus placed too much in the power of the owners to be able to negotiate with them on equal terms "

statute,[14] refused to accord that type of employee the full measure of that liberty which the common law had thrust, willy-nilly, upon workers engaged in other occupations—the answer seems to be this: The courts had made realistic appraisals of the inability of the individual seaman to cope effectively with his employer in bargaining, but had found from observation that the same difficulties were not encountered by the individual worker in other occupations.

Yet recent comments of the Supreme Court tend strongly to undermine that explanation. For, in American Foundries v. Tri-City Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360, 1927, Chief Justice Taft (after stating that labor unions in many industries "were organized out of the necessities of the situation"), said: "A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment."[15] In the light of such judicial utterances, the helplessness of the individual worker vis-a-vis his employer can no longer be said to be an idiosyncratic characteristic of the seaman.

Since, as Mr. Justice Holmes said, "it is revolting to have no better reason for a rule than that so it was laid down long ago", and it "is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past",[16] it is appropriate to ask again: How was it that, during the 19th century, admiralty made a special rule for sailors? An explanation, other than the conventional, at once comes to mind: Many of the obligations owed by shipowners to seamen are not imposed by contract but are imposed by law, they are "relational" and not contractual; specific mention of that fact is made in those cases where unusual provisions in sailors' contracts are jealously scrutinized. The Minerva, supra; The Sarah Jane, 21 Fed.Cas. 449, at page 451, No. 12,348, 1833, cf. Cortes v. Baltimore Insular Lines, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368, 1932.[17] Now Adler,[18] some

---

[14] Indeed, to some extent, in spite of the statutes; see The Minerva, supra (where a statute prescribing that provisions in a seaman's articles were "conclusive and binding" was held to be ineffective as to unusual provisions) and Harden v. Gordon, supra, 11 Fed.Cas. 480, at pages 483, 484, No. 6,047.

[15] This language has subsequently twice been quoted with approval by the court (per Chief Justice Hughes); see Labor Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, 1937, and Amalgamated Workers v. Consolidated Edison Co., 309 U.S. 261, 263, 264, 60 S. Ct. 561, 84 L.Ed. 738, 1940. Cf. West Coast Hotel Co. v. Parrish, supra, 300 U.S. at pages 393–397, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330. For an earlier statement much to the same effect, including a recognition that, in dealings between employers and employees, the "self-interest" of the employee "is often an unsafe guide," see Holden v. Hardy, 169 U.S. 366, 397, 18 S.Ct. 383, 390, 42 L.Ed. 780, 1898.

[16] The Path of the Law, 10 Harv.L. Rev. (1897) 457, Collected Legal Papers (1920), 167, 187.

[17] See Robinson, Admiralty (1940) 291 ff. In this context, it is of interest to recall that, in several respects, the seaman, as a matter of law and on a non-contractual basis, was more favored than other workers: He was entitled whether or not his employer was at fault, to "maintenance and care" if he fell sick or was wounded in the service of the ship (The Osceola, supra) and to indemnity for an injury suffered as a consequence of unseaworthiness in the ship or her equipment (Cortes v. Baltimore Insular Lines, supra); the common law doctrine of assumption of risk was not a defense to his action for personal injury (Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265) and his contributory negligence was not a bar to such an action but merely went to mitigate damages. Beadle v. Spencer, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082.

[18] Business Jurisprudence, 28 Harv.L. Rev. (1914) 135; Labor, Capital and Business, 29 Harv.L.Rev. (1916) 241. Thus a "common calling" had designated any trade or business in which a man engaged if he served not merely one employer but dealt with the public; to any such business, divers non-contractual obligations attached. Adler noted that, in earlier days, all kinds of occupations had been designated as "common", as, for instance, common bakers, common distillers, common cooks, common builders, common surgeons; and that the word was used "in exactly the same sense as in * * * common thief, common scold, that is, in an adverbial rather than

twenty-five years ago, directed attention to the fact that latent in the common law was a concept of obligations derived basically from status. He criticized the treatment of labor problems as if they were exclusively matters of contract. The justification of an "uncompromising adherence to a theory of contract", he wrote,[19] "is supposed by some at least to be found in the statement of Sir Henry Maine 'that the movement of the progressive societies has hitherto been a movement from status to contract,' a statement which has received currency and been accepted as proof that it is such movement that makes societies progressive. How slight a foundation exists for such a position we have seen. In every community there are necessarily two relationships, one of individuals to each other and one of each to all the rest, that is, the community. Contract only deals with one—the relation between individuals. The other is represented by status."[20] Dean Pound, in 1921 [21], apparently stimulated by Adler, pointed to the fact that, opposed to that extreme individualism which had "reached its high watermark in American law in the last quarter of the 19th century", was the "feudal" idea "of relation", or status; our "Anglo-American law is," he said, "pervaded on every hand" by this idea; under its re-awakened influence, our courts, in the 20th century, said Pound, had "taken the

law of insurance practically out of the category of contract" and had "established that the duties of the public service companies are not contractual, as the 19th century sought to make them, but relational." And too, post-19th century legislation, on such subjects as workmen's compensation, had moved forward, seemingly by moving backward, in creating obligations, arising out of status or relations, of a non-contractual character.[22] Pound asserted that the relational or status element in our legal tradition derived from ancient feudal origins, and that the 19th century over-emphasis on all rights and obligations as fundamentally contractual was, in considerable part, a product of Roman (civil) law doctrines; Maine's statement of a progressive shift from status to contract was, according to Pound, descriptive of Roman and not of Anglo-American legal history.

But that thesis stammers when it confronts admiralty's recognition of status or "relational" obligations. For the streams of influence which led to that attitude in admiralty had sources unrelated to feudal institutions. The ancient sea laws, adopted and adapted by the Admiralty Court, were not of English or feudal origin. English and American admiralty judges freely quoted, and incorporated into their domestic law, provisions of maritime codes

an adjectival sense". He showed the error of the view that originally the concept of a common calling had been restricted to a few exceptional businesses, such as that of carriers or innkeepers. Adler suggested a revival of the older concept. Such a revival, embodied in a statute relating to the milk business, was to be endorsed in 1934, in Nebbia v. People of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.

[19] 29 Harv.L.Rev. at 274.

[20] He went on to say: "A contract, after all, is only an agreement to which the law attaches obligations under special circumstances, and, therefore, it does not explain obligations to say that the matter is a contract. The law has no difficulty in attaching obligations to a great variety of relations—they are 'implied', as it is said, or 'imposed by law'. In the case of the ordinary contract between parties who are capable of contracting at all, the law does not impose any obligations upon one which are not imposed equally on the other, but in the relation of employer and employee the law has interposed and still interposes in a great variety of ways, sometimes

on the side of the employer, as by the fellow-servant rule and sometimes on the side of the employee as by the industrial insurance laws, anti-trust acts and many varieties of factory legislation. To foreclose the discussion with the statement that the case is one of contract is therefore to end the argument at the point at which it should begin."

[21] The Spirit of the Common Law (1921), 13 ff.

[22] Goebel, however, suggests that there was so much contract in early English law that one might almost reverse the Maine epigram and say that the shift has been from contract to status.

On the other hand, it will not do to conceal the existence of status or relational obligations by assimilating them to contractual obligations, and then further bemuse ourselves by translating "as if" into Latin and talking of "quasi contractual" duties. As to the anesthetizing effect on lawyers of translating English (or American) into Latin, see Smith, The Use of Maxims in Jurisprudence, 9 Harv.L.Rev. (1895) 13, 25.

(including those pertaining to non-contractual, relational, obligations owing to seamen) devised in other times and in other lands.[23] Indeed, the fact that many rules of maritime law were patently not homemade had contributed to Coke's successful assault on the Admiralty Court[24]. But the Admiralty Court, within the narrowed jurisdiction to which Coke's attack had confined it[25], remained unregenerate; it continued to rely on many concepts imported from abroad. In that court, there had been much borrowing from civil (Roman-derived) law.[26] The equity court had once been similarly infected; perhaps, in part, because of a resulting congeniality, it became not uncommon to speak of the admiralty court as, after a fashion, a court of equity as to matters within its jurisdiction. Such a locution was employed particularly in those cases where seamen were relieved from performance of unusual terms in contracts with their employees;[27] seamen, it was said, "are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees". Harden v. Gordon, supra; Brown v. Lull, supra. And, in such cases, there is explicit reference to the non-contractual foundation of many of the duties owed by shipowners to sailors. Surely in the equity cases, thus used by way of analogy, the "feudal" element was not effective; for Coke, who, as the learned commentator on Littleton, had relished and all but worshipped the ancient niceties of feudal non-contractual obligations,[28] had been no friend of what he regarded as the

---

[23] Maritime law was a kind of private international law; it has been called "the common law of the sea", or a corpus juris maris; see Robinson, Legal Adjustments of Personal Injury in the Maritime Industry, 44 Harv.L.Rev. (1930) 223, 226; but cf. Holmes, J., dissenting in Southern Pac. Co. v. Jensen, 244 U.S. 205, 220, 221, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas. 1917E, 900, 1917, and cf. The Western Maid, 257 U.S. 419, 42 S.Ct. 159, 66 L. Ed. 299, 1922.

[24] This was probably not the sole cause of Coke's attack; despite the fact that the Star Chamber used "foreign" (civil law) procedures, Coke, perhaps because it was too powerful, never attacked it; indeed he sat as a member of that tribunal after his removal from the Kings Bench, and, even in his latter days, said it was "the most honorable court (our Parliament excepted) that is in the Christian world." 4 Inst. 65. But jealousy of a rival jurisdiction was certainly involved in Coke's unfriendliness to Admiralty; see Story, J., in The Jerusalem, Fed.Cas.No.7,294, in Harden v. Gordon, 11 Fed.Cas. 480, page 481, No. 6,047, and in De Lovio v. Boit, 7 Fed.Cas. 418, at pages 421, 422, 426, 427, No. 3,776, 1815.

It may well be that there was another factor: In Coke's day the incomes of the common law judges were largely derived from fees and, therefore, they desired a large volume of litigation in their courts; see Usher, Rise and Fall of the High Commission (1913), 55; cf. Holdsworth, loc. cit. I, 246, 254, 255, 259, 261, 424, 425; Campbell, Lives of the Chancellors (1845), II, 184–185; Taney's dissenting opinion in Taylor v. Carryl, 20 How. 583, 612–617, 15 L.Ed 1028, 1857; Fischer v. Carey, 173 Cal. 185, 159 P. 577, L.R.A. 1917A, 1100, 1105; Goebel, Cases and Materials on the Development of Legal Institutions (1937), 206, 221. As to Coke's avarice and intense love of money, see Lord Birkenhead, Fourteen English Judges, 27, 28, 29, 50; as to the "love of gain" and "greed" as specifically operative in Coke's attack on admiralty, see Benedict, Admiralty, 5th Ed. 1925, I, 781, 756.

Hughes, Admiralty, 2d Ed. 1920, 3, makes an interesting (but perhaps unfounded) suggestion that Coke's "persecution (sic) of Raleigh, the great navigator, was the personification of his hatred of the new order of things", i.e., the development of maritime enterprise under Elizabeth. That Coke used "unscrupulous" methods in his attack on the Admiralty Court, see Holdsworth, loc. cit. I (3rd Ed. 1922) 553ff.

[25] For a recent aftermath of the struggle between common law and admiralty, see The Favorite, 2 Cir., June 13, 1941, 120 F.2d 899.

[26] In the 16th Century, "the Admiralty was referred to as the highest court in which the civil law was practiced", all the judges of that court being civilians; Holdsworth, loc. cit., IV, 238, note 3; cf. V, 126.

[27] Cf. The Minerva, supra; The Juliana, supra; Harden v. Gordon, supra; Brown v. Lull, supra; The David Pratt, supra; Admiralty has not, of course, the full powers of a court of equity, see Kellum v. Emerson, Fed.Cas.No.7,669, 1854; Rea v. The Eclipse, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269, 1890; The Ada, 2 Cir., 250 F. 194, 1918.

[28] In Gardiner v. Butler & Co., 245 U. S. 603, 38 S.Ct. 214, 63 L.Ed. 505, 1918, Holmes, J., in rejecting an argument as-

new-fangled ways of the equity courts which imposed fiduciary obligations not founded on contract, and did his best, with fortunately no success, in his battle with Ellesmere, to eviscerate the jurisdiction of the Court of Chancery [29]. Moreover, even if the unique treatment of seamen were referable to feudal notions of status, that would not explain why in admiralty that feudal element survived or was revived in a period when, with respect to workers in general, it was dormant at common law; it might perhaps be true that admiralty, because it was somewhat isolated from the current common law [30] was to some extent influenced by earlier mercantilist ideas which the common law courts sloughed off during the golden days of laissez-faire. But the doctrinal line of descent was from a legal tradition which was neither essentially English nor feudal.

We must not, in seeking an answer to our question, hope to find an altogether unbroken connection with the past; it is a commonplace that, in the growth of legal systems, new bottles are seldom made for new wine; old formulations, with slight modifications, serve new · purposes [31], so that newly emerging social wants can be implemented without excessive discontinuity. Holmes, Agency, 4 Harv.L.Rev. (1891) 345, 5 Harv.L.Rev.(1891) 1, Collected Legal Papers (1920) 49, 50, 59, 101, 104, 108, 114, 115; Holmes, Law in Science and Science in Law, 12 Harv.L.Rev.(1899) 443, Collected Legal Papers, supra, 210, 211, 238-240 [32]; Maine, Ancient Law, 5th Ed.

1837, 29–32; Powell, Some Aspects of American Constitutional Law, 53 Harv.L. Rev. 529, 532, 551 (1940). Holdsworth remarks [33] that "our system of law has tended to make lawyers exaggerate the amount of continuity there is in the development of legal doctrine."

With that in mind, we should note an intensely practical influence (especially meaningful for us today) sharply manifesting itself in the early 19th century admiralty decisions relating to seamen, which may give us the answer to our question: there is an explicit recognition of the importance of sea-power as an agency of commerce and of national defense. See Harden v. Gordon, supra; The David Pratt, supra; The Juliana, supra. National defense vitally affected the nation as a whole. Such matters were not to be left, a la laissez-faire, to any mere invisible hand guiding the ways of striving individuals bent on purely personal gain. The hand that guided national defense must be visible and forceful; the nation's very existence being at stake, there was no room, when it came to sea-power, for the minimalist dogma that the best government is invariably that which governs the least. The Juliana was decided by Lord Stowel, seven years after Waterloo, when memories of Napoleon's threatened invasion of England, his "continental system" [34] and Trafalgar were still fresh. Story, deciding Harden v. Gordon, in 1823, would not have forgotten the humiliating events of the war of 1812. To protect the men who

---

similating a lease to a contract, said: "But the law as to leases is not a matter of logic in vacuo; it is a matter of history that has not forgotten Lord Coke." See Douglas and Frank, Landlords' Claims in Reorganizations, 42 Yale L.J. (1933) 1002, 1004, note 6.

[29] Story, J., in The Jerusalem, Fed. Cas.No.7,294, 1815, said that the struggle between the courts of common law and the admiralty "originated in the same spirit" of "jealousy and * * * prejudice" which "attempted to break down the whole system of equity". For the story of the battle of the common law courts against the influence of the civilians, see Holdsworth, loc. cit. IV, 252–293.

[30] Inevitably, however, there has been cross-fertilization; Holdsworth, loc. cit. V., 252, 475 ff., shows how the common law of agency was affected by notions borrowed from admiralty which, in turn, had been affected by civil law. And the so-called "six months' rule" in railroad

receiverships was apparently taken over from admiralty, the lien sustained under that rule being called "an admiralty lien on wheels." See Fairman, Mr. Justice Miller (1939) 244, 245.

[31] There is no harm in that. We may rediscover forgotten values in old ideas. Some of them are startling; as Chesterton put it, often we find that not the younger but the older generations are knocking at the door.

[32] On the other hand, Holmes said that "a page of history is worth a volume of logic"; New York Trust Co. v. Eisner, 256 U.S. 345, 348, 41 S.Ct. 506, 507, 65 L.Ed. 963, 16 A.L.R. 660, 1921.

[33] Loc. cit., V, 473. We are indebted to Walton Hamilton for an "old simian proverb": "A doctrine is like a family that is coming up in the world; it fits itself out with an ancient lineage"; 40 Yale L.J. (1931) 1133.

[34] See Sloane, 13 Pol.Sci.Q. 213, reprinted in Beard, An Introduction to the English Historians (1906), 520 ff.

manned the ships was of prime importance.[35]

It would be absurd, of course, even to suggest that, in the prior course of English and American history, there had been no lively appreciation of the worth of sea power: Legend ascribes the foundation of the English navy to King Alfred; William the Conqueror knew what he was about when he established the Cinque Ports; Edward III followed his father in proclaiming himself "Sovereign of the Sea"; Henry VIII created a permanent royal navy; in order to revitalize a trade helpful in time of war, the fishing industry—weakened by the Reformation which did away with the religious obligation to eat fish—Edward VI established "Political Lent" by a statute requiring fish, instead of flesh, to be eaten on Fridays, Saturdays, Ember Days and during Lent;[36] the adventures of men such as Drake, Frobisher and Raleigh, and the defeat of the Spanish Armada, tell of the marked interest in sea power in Elizabeth's reign; the troubles of Charles I over "ship money" are part of the story; no less is the serious side of the life of Samuel Pepys, who, famous as a diarist, is honored as a great Secretary of the Admiralty; etc., etc.[37]

For all that, this point remains: One of the impulses which apparently contributed to the survival of the admiralty doctrine as to seamen was vigorously reenforced by early 19th century events affecting both England and this country. And that stimulus still has vitality. See Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993, where the court (citing Harden v. Gordon) speaks of "the maintenance of a merchant marine for the commercial service and maritime defense

of the nation by inducing men to accept employment in an arduous and perilous service."

Our historical survey is necessarily sketchy; students of history may—and we hope they will—some day give us a more elaborate and precise story. With particular reference to the background of the doctrine we have been discussing, we have in mind, too, that, as more and more historians have come to recognize, history is not an exact science but more in the nature of an art, and that, aside from the inherent subjective factor involved in the selection of "significant" facts, it lacks exactitude for a variety of reasons including this: Many ideas that, in a past period, have profoundly shaped men's conduct often find no expression which survives in documentary form; for the dominant ideas of any period are frequently so taken for granted that the men of that period may be little aware of them, and, even if such an awareness exists, those ideas seem so "self-evident" that no one bothers to write them down[38]. And so as to the matters we have been discussing: There is no certainty that we have adequately recaptured the thought processes of the early 19th century judges sitting in admiralty. The best we can do is to employ that method upon which even the professional historian perforce must rely—conjecture as best we can from the expressions available in the surviving written records. Perhaps professional historians will discover other data which will necessitate revision of our conjecture; but at the moment it appears to have a reasonable foundation in fact.

At any rate it is permissible to say that the promotion of national defense was one of the important reasons—and one

[35] See, however, Holdsworth, loc. cit., X, 381 as to the use of press gangs; cf. Zimmerman, Impressment of American Seamen.

[36] An Elizabethan statute which continued "Political Lent" was entitled, "Certain politique considerations made for the maintenance of the navy". Holdsworth, loc. cit. IV, 328.

[37] See, e.g., Medley, English Constitutional History, 6th Ed. 1925, 513–519; Holdsworth, loc. cit., IV, 327–329, 399; VI, 314–318; X, 5; XI, 402–404, 407–411; Abbott, Conflicts with Oblivion, 2d Ed. 1935, 3 ff., 65 ff.

[38] See e.g., Dunning, Truth in History, 19 Am.Hist.Rev. 221; Pirenne, What are Historians Trying to Do? in Rice, Methods in Social Science (1931), 435;

Hamilton, The Ancient Maxim Caveat Emptor, 40 Yale L.J. (1931) 1133, 1185, 1186; Johnson, The Historian and Historical Evidence (1926); Schlesinger, History: Mistress and Handmaid; in Essays on Research in the Social Sciences (1931); Simkhovitch, Approaches to History, 51 Pol.Sci.Q (1936) 117, 119; 44 Pol.Sci.Q (1929) 481; Goebel, Felony and Misdemeanor (1937) XXVII; Goebel, Introduction, to Du Bois, The English Company After the Bubble Act (1938), VII; Cole, The Relativity of History, 48 Pol.Sci.Q. (1933) 131; Schuyler, Law and Accident in History, 45 Pol.Sci.Q (1930) 272; cf. Whitehead, Science and The Modern World (1925), 69.

surely pertinent today—which led to the perpetuation of this rule: The liberty of the individual employee to bind himself firmly—absent fraud, coercion or the like—in a contract with his employer, no matter how harsh or unusual its terms, is not to be strictly applied to workers who go to sea. As to such provisions in their contracts, because they are "wards of admiralty", a distinctive doctrine is applicable; a peculiar burden is cast on the employer.

The legislative policy has been to extend that unique protection; in order to effectuate the Congressional intention, statutes of that type have been liberally construed to favor the seaman (Bainbridge v. Merchants' & Miners' Transp. Co., 287 U.S. 278, 53 S.Ct. 159, 77 L.Ed. 302), who has been called the "ward of the legislature"[39]. That the legislative policy, in turn, should perhaps affect the judicial attitude, even as to matters not completely within the boundaries of a statute, was suggested by Mr. Justice Holmes, on Circuit, in Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A.,N.S., 1194, (1908)[40], recently cited and quoted with approval in Keifer & Keifer v. Reconstruction F. Corp., 306 U.S. 381, 391, note 4, 59 S.Ct. 516, 83 L.Ed. 784, 1939.[41]

This court has consistently followed the rule as to protection of seamen, as interpreted in our decisions above cited. We shall do so here. On the record now before us, the instant case lacks the differentiating circumstances we found in Sitchon v. American Lines, supra, and sufficiently resembles the facts in Bonici v. Standard Oil Co., supra, so that it should not have been decided against appellant on the facts as presented on the motion for summary judgment. Here the seaman had no lawyer nor other competent adviser representing him when he signed the release. There should be a trial of the issues, on evidence, at which the burden will be on the appellee to sustain the release "as fairly made with and fully comprehended by the seaman." (Harmon v. United States, 5 Cir., 59 F.2d 372, 373; Bonici v. Standard Oil Co., supra); in that connection, it will be significant, particularly because of the meager consideration, whether appellant had any knowledge or intimation, when he signed the release, that he was suffering, incipiently or otherwise, from tuberculosis.

The summary judgment for appellee, and the order dismissing the complaint as to it, are reversed.

---

[39] Robinson, Admiralty (1940) 284.

[40] He there said: "We recognize that courts have been disinclined to extend statutes modifying the common law beyond the direct operation of the words used, and that at times this disinclination has been carried very far. But it seems to us that there may be statutes that need a different treatment. A statute may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: 'We see what you are driving at, but you have not said it, and therefore we shall go on as before.' "

[41] The Supreme Court in the Keifer & Keifer case, supra, also cites, inter alia, Stone, The Common Law in the United States (1936), 50 Harv.L.Rev. 4, 13 and Landis, Statutes and The Source of Law, Harvard Legal Essays, 213. See Goebel Cases and Materials on the Development of Legal Institutions, supra, 747, 748, for a criticism of Landis' article in so far as it purports to find support in the Year Books.