# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #009

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **6th day of March, 2026** are as follows:

**BY Penzato, J.:**

2025-C-00827     PLAQUEMINES PORT HARBOR & TERMINAL DISTRICT     VS. TUAN NGUYEN (Parish of Plaquemines)

AFFIRMED. SEE OPINION.

McCallum, J., additionally concurs and assigns reasons.

# SUPREME COURT OF LOUISIANA

## No. 2025-C-00827

## PLAQUEMINES PORT HARBOR & TERMINAL DISTRICT

## VS.

## TUAN NGUYEN

On Writ of Certiorari to the Court of Appeal,
Fourth Circuit, Parish of Plaquemines

**PENZATO, Justice Pro Tempore**[*]

This Court granted a writ of certiorari to determine whether a public port authority may lawfully expropriate private property for the purpose of leasing that property to a private company for its exclusive development and use. Finding that such a taking is not for a public purpose, we conclude it is prohibited by the Louisiana Constitution and affirm the lower courts.

## FACTS AND PROCEDURAL HISTORY

The Plaquemines Port, Harbor & Terminal District (Plaquemines Port) instituted this quick-take expropriation suit[1] to acquire approximately twenty-nine acres of unimproved, immovable property owned by Tuan Nguyen. The property is located within the 630-acre footprint of a liquified natural gas and container port complex being developed in Plaquemines Parish as the Delta LNG Project. As part of the project, Plaquemines Port will lease property to Venture Global LNG, a liquified natural gas processing and transportation company. The project includes construction of pretreatment facilities, a liquification plant, liquified natural gas

---

[*]    Justice Allison H. Penzato, appointed Justice Pro Tempore, sitting for the vacancy in Louisiana Supreme Court District 1.

[1]    Title 19, part IV of the Revised Statutes provides a mechanism for port commissions and port authorities filing a suit for expropriation to acquire title to the property prior to judgment in the trial court. *See* La. R.S. 19:141.

storage tanks, a power generation system, and three or more liquified natural gas berthing docks. To fulfill its lease obligation, Plaquemines Port must acquire land, including Nguyen's property. Plaquemines Port alleged the expropriation of land for the Delta LNG Project is deemed a paramount public purpose as it aligns with the broader goals of economic growth, job creation, energy security, and environmental stewardship, and will assist Plaquemines Port in furthering its mission to expand and facilitate the transport of goods and services. Plaquemines Port deposited $441,600.00 into the registry of the court, representing the alleged amount of just compensation for the property.

Nguyen filed a motion to dismiss the petition pursuant to La. R.S. 19:147,[2] which allows a challenge to the validity or extent of a taking on the ground the property was not expropriated for a public use. Nguyen contended Plaquemines Port's sole purpose for the expropriation is to receive lease payments from Venture Global, which is not a port activity that facilitates the transportation of goods or persons. Plaquemines Port opposed the motion, arguing the expropriation is for the public purpose of port expansion, including the leasing of its property for the expansion of industrial development and development of the Delta LNG Project.

---

[2]    La. R.S. 19:147 provides:

> A. Any defendant desiring to contest the validity or extent of the taking on the ground that the property was not expropriated for a public use may file a motion to dismiss the suit within twenty days from the date the notice was served on him. He shall certify thereon that a copy thereof has been served personally or by mail on either the plaintiff or his attorney of record in the suit. This motion shall be tried contradictorily with the plaintiff.

> B. Failure to file the motion to dismiss or to serve a copy thereof on the plaintiff within twenty days from the date the notice was served on him constitutes a waiver of all defenses to the suit except claims for compensation.

> C. In the event a defendant files a timely motion to dismiss challenging the validity or extent of the taking, the court shall set the matter for hearing within thirty days after the filing of the motion to dismiss and shall render a decision within five days after the case is submitted. A judgment rendered determining the validity or the extent of the taking pursuant to this Part shall be signed and designated as a final judgment by the court for the purpose of an immediate appeal.

After a contradictory hearing, the trial court granted Nguyen's motion and dismissed the petition for expropriation without prejudice. In written reasons for judgment, the trial court found Plaquemines Port's sole purpose for expropriating the property is to act as a leaseholder for property that will be utilized and occupied entirely by Venture Global. Because Venture Global, not Plaquemines Port, will facilitate processing and transportation of the natural gas operations, the trial court found the expropriation unconstitutional. The court of appeal agreed that Plaquemines Port failed to satisfy the public purpose requirement of La. Const. art. I, §4, and affirmed. *Plaquemines Port Harbor & Terminal District v. Nguyen*, 2024-0614 (La. App. 4 Cir. 5/29/25), 421 So. 3d 176.

This Court granted Plaquemines Port's application for a writ of certiorari to review the rulings of the lower courts. *Plaquemines Port Harbor & Terminal District v. Nguyen*, 2025-0827 (La. 10/22/25), 421 So. 3d 882.

## DISCUSSION

As a preliminary matter, we reject Plaquemines Port's argument that Nguyen's motion to dismiss raised an exception of no cause of action and is subject to the procedural and evidentiary rules applicable thereto. Plaquemines Port filed its petition for expropriation pursuant to the quick-taking provisions of La. R.S. 19:141, *et seq.* La. R.S. 19:147(A) specifies that "[a]ny defendant desiring to contest the validity or extent of the taking on the ground that the property was not expropriated for a public use may file a motion to dismiss the suit … [which] shall be tried contradictorily with the plaintiff." Failure to comply with this procedure results in a waiver of all defenses to the suit except claims for compensation. La. R.S. 19:147(B). In a quick-take proceeding under these provisions, a peremptory exception is not the appropriate procedural vehicle to challenge the public use supporting the expropriation. *See Lafayette City-Parish Consolidated Government v. Lucile B. Randol Heirs, L.L.C.*, 2021-778 (La. App. 3 Cir. 8/3/22), 362 So. 3d 639,

643, *writ denied*, 2022-01533 (La. 12/6/22), 351 So. 3d 368 (finding a motion to dismiss, rather than a peremptory exception, is the proper procedural vehicle to challenge the public use requirement for expropriation under the quick-taking provisions of La. R.S. 19:139 *et seq.*, applicable to the City and Parish of Lafayette). Furthermore, since La. R.S. 19:147(A) specifically provides that a motion to dismiss must be tried contradictorily with the plaintiff, there is no legal support for Plaquemines Parish's argument that Nguyen's challenge must be decided on the pleadings alone, with all factual allegations accepted as true.[3]

On the merits, this case challenges the scope of a Louisiana port's authority to expropriate privately owned property.[4] Both the federal and state constitutions limit the government's authority to expropriate property. The Fifth Amendment of the United States Constitution, made applicable to the states pursuant to the Fourteenth Amendment, provides "No person shall … be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation." Article I, section 4(B) of the Louisiana Constitution provides "[p]roperty shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation[.]" Under both constitutions, any expropriation must be for a public use or purpose, and just compensation must be provided.

---

[3] Although the trial court here erroneously referred to the motion to dismiss as raising a peremptory exception of no cause of action, we find no error in the proceeding itself or the trial court's legal analysis of the constitutional issue. Moreover, we find the court of appeal applied the correct standard in conducting its review.

[4] There is no question that Plaquemines Port is a public corporation and political subdivision of the State of Louisiana, coextensive with the boundaries of Plaquemines Parish. La. R.S. 34:1351. Plaquemines Port is authorized to regulate commerce and traffic within its jurisdiction, which includes access to the first fifty miles of the Mississippi River, to best serve public interest. *See* La. R.S. 34:1360. Plaquemines Port additionally has the authority to expropriate property within its district under the provisions of La. R.S. 19:141, *et seq. See* La. Const. art. VI, §23 (authorizing political subdivisions to acquire property for public purpose by expropriation); La. R.S. 34:1353(C) (authorizing Plaquemines Port to expropriate property under the provisions of Part IV, Title 19 of the Revised Statutes).

4

We begin our analysis with the constitutional provisions at issue. *St. Bernard Port, Harbor & Terminal District v. Violet Dock Port, Inc., LLC*, 2017-0434 (La. 1/30/18), 239 So. 3d 243, 249. Significantly, in 2006, the people of Louisiana amended our state constitution to limit the definition of public purpose for expropriation. The amendment was in response to the United States Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), which held that the transfer of land from one private owner to another in the name of economic development satisfied the requirement of a public purpose. *See St. Bernard Port, Harbor & Terminal District v. Violet Dock Port, Inc., LLC*, 2017-0434 (La. 1/30/18), 239 So. 3d 243, 250. As amended, Article I, section 4 pertinently provides:

(A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.

(B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.

(2) As used in Subparagraph (1) of this Paragraph and in Article VI, Section 23 of this Constitution, "public purpose" shall be limited to the following:
* * *
(b) Continuous public ownership of property dedicated to one or more of the following objectives and uses:
* * *
(vi) Public ports and public airports to facilitate the transport of goods or persons in domestic or international commerce.
* * *
(3) Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose pursuant to Subparagraph (1) of this Paragraph or Article VI, Section 23 of this Constitution.

Plaquemines Port contends the requirement of a public purpose for the expropriation at issue is satisfied because Article I, section 4(B)(2)(b)(vi) specifically recognizes public port activity as a public purpose. Essentially, it argues there is a public purpose for the taking because Plaquemines Port, itself, is a public port, and its ownership and lease of the property will facilitate the transport of goods in domestic and international commerce.

To avoid the prohibition against the taking of property for the predominant use by a private entity, Plaquemines Port argues Article I, section 4 specifically recognizes an exception, authorized by Article VI, section 21, which pertinently provides:

> **(A) Authorization.** In order to (1) induce and encourage the location of or addition to industrial enterprises therein which would have economic impact upon the area and thereby the state, (2) provide for the establishment and furnishing of such industrial plant, (3) facilitate the operation of public ports, or (4) provide movable or immovable property, or both, for pollution control facilities, the legislature by law may authorize, subject to restrictions it may impose, any political subdivision, public port commission, or public port, harbor, and terminal district to:
>
> (a) issue bonds, subject to approval by the State Bond Commission or its successor, and use the funds derived from the sale of the bonds to acquire and improve industrial plant sites and other property necessary to the purposes thereof;
>
> (b) acquire, through purchase, donation, exchange, and expropriation, and improve industrial plant buildings and industrial plant equipment, machinery, furnishings, and appurtenances, including public port facilities and operations which relate to or facilitate the transportation of goods in domestic and international commerce; and
>
> (c) sell, lease, lease-purchase, or demolish all or any part of the foregoing.

As a general rule, articles of the constitution are construed and interpreted using the same principles applicable to statutes. *Snowton v. Sewerage and Water Board*, 2008-399 (La. 3/17/09), 6 So. 3d 164, 168. The starting point for interpretation of a constitutional provision is the language of the provision itself. *See Menard v. Targa Resources, L.L.C.*, 2023-00246 (La. 6/27/23), 366 So. 3d 1238,

6

1241. Words and phrases of a constitutional provision must be read in context and construed according to the common and approved usage of the language. *See* La. R.S. 1:3. Such provisions are construed to give effect to the purpose indicated by a fair interpretation of the language used. Where a constitutional aim is evident from the language used, courts need not consider the historical basis for a constitutional prohibition and may not, by separately considering related constitutional provisions, arrive at a construction that detracts from the manifest meaning of the related provisions. *Perschall v. State*, 96-0322 (La. 7/1/97), 697 So. 2d 240, 255. Additionally, "[s]ince expropriation proceedings are in derogation of the right of individuals to own property, the law governing these proceedings must be strictly construed against the expropriating authority." *State Through Dept. of Transp. and Development v. Estate of Davis*, 572 So. 2d 39, 42 (La. 1990).

A plain reading of the constitution establishes that a public purpose is a threshold requirement for expropriation. *See* La. Const. art. I, §4(B). Article I, section 4(B)(2)(b)(vi) limits the definition of "public purpose" for expropriation to "[c]ontinuous public ownership of property dedicated to one or more of the following objectives and *uses*," one of which is "[p]ublic ports … to facilitate the transport of goods or persons in domestic or international commerce." (Emphasis added.) To meet the constitutional definition of public purpose, dedicated *use as a public port* is essential. For example, in *St. Bernard Port, Harbor & Terminal District*, the expropriation of a privately-owned port facility satisfied the public purpose requirement of Article I, section 4(B)(1), as the taking was a logical extension of port services. *St. Bernard Port, Harbor & Terminal District*, 239 So. 3d at 249. The purpose of the taking was continued *use as a public port*, notwithstanding that its operations would be handled by another entity pursuant to a lease. *See St. Bernard Port, Harbor & Terminal District*, 239 So. 3d at 251 n.9; *see also St. Bernard Port, Harbor & Terminal District*, 239 So. 3d at 258 (Weimer, J.,

7

dissenting) (quoting the trial court's reasoning that "[t]he predominant use for the property would be by the public, not for use by, or for transfer of ownership to any private person or entity").

Plaquemines Port is a public port authority. However, it is undisputed that Plaquemines Port's expropriation of Nguyen's property is for the sole purpose of leasing it to a private company to facilitate transportation of the private company's own goods. Plaquemines Port argues that its lease of the property to a single user should not reclassify a port it owns as private. Plaquemines Port suggests that consideration of its lessee's status as a private entity is relevant only to application of Article VI, section 21(A), which provides an exception to public ports for the expropriation of property to be predominantly used by a single private entity. We disagree.

The plain language of the constitution restricts a public purpose to the public port authority's ownership of property dedicated to specified *uses*, including *public ports*. We reiterate that words and phrases of a constitutional provision must be read in context and construed according to the common and approved usage of the language. *See* La. R.S. 1:3. Such provisions are construed to give effect to the purpose indicated by a fair interpretation of the language used. *Perschall*, 697 So. 2d at 255. Applying these principles, Plaquemines Port is not seeking ownership of the property for dedicated *use as a public port*. Instead, this is a taking by a public port authority for its lessee to use as a private port—essentially what *Kelo* allowed as authorized under the United States constitution, and what the 2006 Louisiana constitutional amendments sought to prohibit. The fact that Plaquemines Port will own the property and benefit from the lease contract is immaterial. Article I, section 4(B)(3) specifically provides that "[n]either economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose."

Plaquemines Port's reason for expropriation does not fit the constitutional definition of a public purpose. Without a public purpose for the expropriation, the exception for predominant use by a private entity is inapplicable.

## CONCLUSION

Under Louisiana law, when the state or a political subdivision seeks to expropriate property, the primary question is whether the taking is for a public purpose. *See* La. Const. art. I, §4(B)(1). Plaquemines Port failed to demonstrate the expropriation of Nguyen's property is for a valid public purpose as defined by the Louisiana Constitution. Consequently, we find the motion to dismiss filed by Nguyen was properly granted, and affirm.

**AFFIRMED.**

# SUPREME COURT OF LOUISIANA

## No. 2025-C-00827

## PLAQUEMINES PORT HARBOR & TERMINAL DISTRICT

## VS.

## TUAN NGUYEN

On Writ of Certiorari to the Court of Appeal, Fourth Circuit, Parish of Plaquemines

**McCALLUM, J., additionally concurs and assigns reasons.**

An individual is free only to the extent he has sole and exclusive dominion over what he owns. Americans affirm this each day as they labor to acquire property, seeking through ownership the independence it secures. This case raises fundamental issues concerning the government's interference with this freedom.

I agree with the majority that the Plaquemines Port, Harbor & Terminal District's attempt to expropriate Tuan Nguyen's property does not fall within the authority conferred by the Louisiana Constitution to take private property for a public purpose. I write separately to underscore the fundamental nature of the right to private ownership of property—the cornerstone of a free society. This right may be infringed by the government only upon a showing of a genuine and legitimate public interest.[1] The issue in this case is no small matter.

The United State Supreme Court observed in *Lynch v Household Finance Corp.*, 405 U. S. 538, 552 (1972): "A fundamental interdependence exists between the personal right to liberty and the personal right to property. Neither could have meaning without the other. That rights in property are basic civil rights has long been

---

[1] *See, e.g., Buchanan v. Warley*, 245 U.S. 60, 74 (1917) ("Property is more than the mere thing which a person owns. It is elementary that it includes the right to acquire, use, and dispose of it. The Constitution protects these essential attributes of property. *Holden v. Hardy*, 169 U. S. 366, 391, 18 Sup. Ct. 383, 42 L. Ed. 780. Property consists of the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land. 1 Blackstone's Commentaries (Cooley's Ed.) 127.)

recognized." Our founding fathers held property rights as sacrosanct. John Adams wrote in 1790: "Property must be secured or Liberty cannot exist."[2]

Our decision in this matter should not be read as impugning the Plaquemines Port's good faith; indeed, its benevolent intentions may readily be acknowledged. Even so, we are compelled to reach the same conclusion. It is important to remind ourselves—even in seemingly benign cases such as this—of the significant consequences that may follow when more suspect cases arise.

Private property ownership is ancient in its origins. The Old Testament recognizes private property rights. Two of the Ten Commandments, set forth in the Exodus 20:15 and 20:17, declare, respectively, "thou shalt not steal" and "thou shalt not covet," each presupposing the existence of private property rights. Moving boundary markers is proscribed at least five times in the Old Testament (*See* Deuteronomy 19:14, 27:17; Proverbs 22:28, 23:10; Job 24:2).[3] Respect for boundaries between adjoining parcels is a protective mechanism for the property of each owner. The Old Testament's implicit recognition of private property is echoed in the New Testament. Jesus reiterated the prohibition on theft (*See* Mark 10:9; Luke 18:20). The apostle Paul also spoke against theft, and in the process, implicitly recognized private property rights (*See* Romans 13:9; 1 Corinthians 6:9-10; Ephesians 4:28). An account recorded in 1 Kings 21, details a "governmental expropriation" of Naboth's vineyard by Ahab and Jezebel that involved murder. Elijah, the prophet, rebuked the royal couple and pronounced judgment upon them.

The Magna Carta of 1215 contained various provisions respecting private property rights. Chapter 39 of the Magna Carta provided: "No free man shall be taken, imprisoned, disseised (deprived of land or property), outlawed, banished, or

---

[2] John Adams, Discourses on Davila, in 6 *The Works of John Adams* 280 (Charles Francis Adams ed., 1851).

[3] Theologian John Calvin felt this was a double sin violating the commandments against both theft and false witness.

in any way destroyed, nor will [w]e proceed against or prosecute him, except by the lawful judgment of his peers and by the law of the land."[4] This fabled document contained specific limitations on the power of expropriation by the Crown. Many of these same principles would develop to underlie private property concepts held by American colonists, and ultimately the United States Constitution.[5]

John Locke, writing in the aftermath of the Glorious Revolution of 1688, viewed private property rights as being derivative of natural law, which exists even before the establishment of political authority. It necessarily follows that a principal purpose of government is to safeguard the natural property rights of its citizens.[6] Locke's insistence on the rights of property owners reflected his belief in their inviolability.

William Blackstone, a judge and legal scholar, expounded on Locke's views and reinforced them in his Commentaries on the Laws of England, published originally between 1765 and 1769. Blackstone proposed that, "The third absolute right, inherent in every Englishman, is that of property…"[7] Because of the Magna Carta, the works of Locke, and Blackstone's Commentaries, it has been said: "In the eighteenth century pantheon of British liberty there was no right more changeless and timeless than the right to property."[8] This conviction was transmitted to the American colonies, where it became firmly embedded in their legal and political traditions.

Our founding fathers drew heavily on the views of their British contemporaries. As with the British, America's founders believed liberty could be

---

[4] Magna Carta, ch. 39, in A. Howard, Magna Carta: Text and Commentary 43 (1964).

[5] Bernard H. Siegan, *Economic Liberties and the Constitution* 1-9 (2d ed. 2006).

[6] Ellen Frankel Paul, Freedom of Contract and the "Political Economy" of *Lochner v. New York*," 1 N.Y.U. J.L. & Liberty 515, 528-30 (2005).

[7] William Blackstone, *Commentaries on the Laws of England* vol. 1, at 135 (1765; reprinted 1979).

[8] John Phillip Reid, *Constitutional History of the American Revolution: The Authority of Rights* 27 (1986).

lost if private rights in property were not protected.[9] James Madison, who authored the Bill of Rights, recognized that property rights are fundamental to liberty, writing: "Government is instituted no less for protection of the property than of the persons of individuals. The one as well as the other, therefore, may be considered as represented by those who are charged with the government."[10] Madison included key safeguards of property rights into the Fifth Amendment to the Constitution. Among these is the Takings Clause, prohibiting the taking of private property for public use without just compensation. His proposed draft of the Fifth Amendment included that no person shall "be obliged to relinquish his property, where it may be necessary for public use, without a just compensation."[11]

Notably, Madison put these protections of private property rights in the same amendment as the safeguards governing criminal trials. This juxtaposition underscores the close connection between property rights and individual liberty in the eyes of our founders and highlights Madison's commitment to private property as a bedrock of the new national government.[12]

The twentieth century saw an erosion of the importance of private property. This incremental undermining of property rights culminated in the latter part of the twentieth century and early on in this century, when the United States Supreme Court issued its decisions in *Hawaii Housing Authority v. Midriff*, 467 U. S. 229(1984) and *Kelo v. City of New London*, 545 U. S. 469 (2005). *Kelo* is particularly troubling because the Court ruled that the city of New London, New Jersey was justified in condemning property of private homeowners in order to transfer it to a different private party that the city believed could make better use of it. The court, in doing

---

[9] *Id*. at 33.

[10] *The Federalist* No. 54 (James Madison) at 339 (Clinton Rossiter ed., 1961).

[11] James Madison, Speech Proposing Amendments to the Constitution (June 8, 1789), in 1 Annals of Cong. 434 (Joseph Gales ed., 1834).

[12] James W. Ely, Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights* 30-32 (3d ed. 2008).

so, erroneously conflated public use with public utility. In his dissent, Justice Thomas implicitly acknowledged this point:

> Though one component of the protection provided by the Takings Clause is that the government can take private property only if it provides "just compensation" for the taking, the Takings Clause also prohibits the government from taking property except "for public use." Were it otherwise, the Takings Clause would either be meaningless or empty. If the Public Use Clause served no function other than to state that the government may take property through its eminent domain power—for public or private uses—then it would be surplusage.

*Kelo*, 545 U.S. at 507 (Thomas, J., dissenting).

Here, as in *Kelo*, "public utility" is not tantamount to "public use" and cannot form the basis for a "public taking." A landowner's inability, or unwillingness, to use property in a way that generates more revenue than another owner might is immaterial to the assessment of eminent domain. Are we to allow expropriation based solely on one entity's superior ability to earn money or create jobs?

No one focused on private property rights more than Karl Marx, but he did so only in the context of their eradication. The disastrous results of Marx's approach on individual liberty ought to serve as a constant warning. In his political treatise, The Road to Serfdom, Friedrich Hayek argued to the contrary for private property as the foundation of individual liberty:

> The system of private property is the most important guaranty of freedom, not only from those who own property, but scarcely less for those who do not. It is only because the control of the means of production is divided among many people acting independently that nobody has complete power over us, that we as individuals can decide what to do with ourselves. If all the means of production were vested in a single hand, whether it be nominally that of "society" as a whole or that of a dictator, whoever exercises this control has complete power over us.[13]

---

[13] Friedrich A. Hayek, *The Road to Serfdom* 103-04 (University of Chicago Press 1944).

The power of expropriation, known in the seventeenth and eighteenth centuries as the "despotic power," is mighty; it permits the State to compel the surrender of individuals' property, which is the surrender of a portion of their freedom and independence. For that reason, our statutory scheme and case law requires that this power be used only when the Constitution's strict conditions are satisfied. A purported public purpose cannot be speculative or pretextual. It must be genuine, and demonstrable. When government exceeds the limitations imposed by the Constitution, the resulting harm is clear. It interferes with the foundation upon which individual liberty rests. If private ownership may be displaced without a showing of a legitimate public use, then the security of all property is at risk, as is the independence that ownership of property fosters.

Because the Plaquemines Parish Port has failed to demonstrate the constitutionally required public purpose, its attempted expropriation cannot stand. In affirming the lower courts, we recognize the broader principle that a free society depends upon secure ownership, and that governmental power, however well-intentioned, must remain confined to the limits set forth in our Constitution.